APPEAL NO. 22-10338

In The

# United States Court of Appeals

### For The Eleventh Circuit

**M.H.; J.H.,**
**On behalf of their minor child, C.H.,**

*Plaintiffs – Appellants*,

**versus**

**OMEGLE.COM LLC,**

*Defendant – Appellee.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA

———————

## BRIEF FOR CHILD USA, RAINN (RAPE, ABUSE AND INCEST NATIONAL NETWORK), CAROL HEPBURN, ESQ., JOHN & JANE DOES 1-4 MICHA STAR LIBERTY, ESQ. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

———————

**Vivek Jayaram**
**Elizabeth Austermuehle**
**Jayaram Law**
**125 S. Clark Street**
**Suite 1175**
**Chicago, IL 60603**
**Tel: 646-325-9855**
**Tel: 312-736-1227**
**Vivek@jayaramlaw.com**
**Liz@jayaramlaw.com**

**Marci A. Hamilton, Esq.**
**CEO & Founder, CHILD USA**
**3508 Market Street, Suite 202**
**Philadelphia, PA 19104**
**Tel: (215) 539-1906**
**mhamilton@childusa.org**

**Jessica Schidlow, Esq.**
**Staff Attorney, CHILD USA**
**jschidlow@childusa.org**

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amici Curiae* CHILD USA, RAINN (RAPE, ABUSE AND INCEST NATIONAL NETWORK), CAROL HEPBURN, ESQ., JOHN & JANE DOES 1-4 and MICHA STAR LIBERTY, ESQ., and through undersigned counsel, pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rules 26.1-1, 26.1-2, and 26.1-3, hereby submits their Certificate of Interested Persons and Corporate Disclosure Statement.

In alphabetical order, following are all trial judges, attorneys, persons, association of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, and other identifiable legal entities related to a party:

Carol L. Hepburn, Esq.

C.H. (a minor child)

Child USA

Elizabeth Austermuehle, Esq.

Focal PLLC

Frank R. Schirripa, Esq.

Hatch Rose Schirripa & Cheverie, LLP

Hillary M. Nappi, Esq.

James T. Prusinowski, Esq.

James R. Marsh, Esq.

Jayaram Law, Inc.

Jennifer Freeman, Esq.

Jessica Schidlow, Esq.

J.H. (C.H.'s parent)

Marci Hamilton, Esq.

Margaret E. Mabie, Esq.

Marsh Law Firm, PLLC

M.H. (C.H.'s parent)

Micha Star Liberty, Esq.

Omegle.com, LLC

RAINN

Stacia N. Lay, Esq.

The Honorable James B. Clark

The Honorable Kevin McNulty

Trimboli & Prusinowski, LLC

Venkat Balasubramani, Esq.

Vivek Jayaram, Esq.

                                    /s/ Vivek Jayaram, Esq.
                                    Vivek Jayaram, Esq.
                                    *Counsel for Amici Curiae*

## <u>STATEMENT OF INTERESTS OF AMICI CURIAE</u>

**<u>CHILD USA</u>:** CHILD USA is the leading national non-profit think tank fighting for the civil rights of children. CHILD USA engages in in-depth legal analysis and cutting-edge social science research to determine the most effective public polices to protect children from sexual abuse and online exploitation and to ensure access to justice for victims.  Distinct from an organization engaged in the direct delivery of services, CHILD USA produces evidence-based solutions and information needed by policymakers, organizations, courts, media, and society as a whole to increase child protection and the common good. CHILD USA's interests in this case are directly correlated with its mission to increase child protection and to eliminate barriers to justice for victims of sexual abuse and online exploitation. CHILD USA is an expert on the proximate, immediate, and persistent harms to child-victims whose imagery is hosted and trafficked online, the ways in which digital communication platforms like Omegle exacerbate this abuse and its attendant harms, and on the measures Congress has taken to address the epidemic of child sexual exploitation by holding entities like Omegle accountable.  CHILD USA thus has a substantial interest in ensuring that this Court uphold the broad remedial purposes of the relevant child exploitation and trafficking legislation.

**<u>RAINN</u>**: RAINN is the nation's largest anti-sexual violence organization, whose purpose is to provide services to victims of sexual violence and advocate for

improvements to the criminal justice system's response to sexual violence. RAINN founded and operates the National Sexual Assault Hotline, and in its over 25 years of operation has helped more than three million survivors of sexual assault and their loved ones. RAINN is a leader in public education on sexual violence, provides consulting services to various industries on best practices for prevention and response to sexual assault/harassment, and advocates on the state and federal levels to improve legislation on sexual violence.

**CAROL L. HEPBURN, ESQ.:** Carol Hepburn is an attorney with 43 years of experience, working first as a prosecutor, then in civil matters for victims of serious personal injury. She is an experienced and dedicated advocate for crime victims' rights. Carol has assisted countless victims of sexual violence, including victims of child sexual abuse and child pornography, obtain substantial restitution in criminal matters as well as civil money damages. Her practice for over ten years has focused primarily on representing individuals who are the subjects of child sex abuse images. In 2013, he was awarded the *Public Justice Award* by the Washington State Association for Justice for her work on behalf of survivors of child pornography crimes. Carol is among a select group of attorneys leading a national effort to recover substantial damages for victims of child pornography. Carol is also a member of an international working group that is working with child sexual abuse survivors to better understand the impacts of this crime and to identify the legislative,

policy, and therapeutic changes required to better meet the needs of these survivors.  Carol hopes this case will lead to justice and accountability for the benefit of her clients.

**MICHA STAR LIBERTY, ESQ**.: Micha Star Liberty is the owner of Liberty Law Office, Inc. where she primarily represents victims of sexual violence and abuse. Micha was awarded the *Street Fighter of the Year* award in 2015 by the Consumer Attorneys of California for holding the Contra Costa County School District accountable for a case of child sexual molestation where the District was aware of the abuse but took no action. In 2018, Micha was awarded the *Women's Advocate of the Year Award* for prosecuting numerous cases related to the #metoo movement. Micha regularly speaks at conventions and other public events on the topics of sex trafficking, online exploitation and abuse, child sexual abuse, and trauma-informed practices. Micha's interests in this case are directly correlated with her decades of experience working with and supporting victims of sexual violence.

**JOHN & JANE DOES 1-4:** John and Jane Does are victims of child sexual abuse and online exploitation each of whom have suffered unimaginable harms as a result of having their imagery trafficked online to untold numbers of predators around the world. Victims describe relentless symptoms of anxiety, fear, shame, depression, PTSD, as well as drug and alcohol misuse, a deep mistrust of others and of their own bodies–simply put, the effects of their abuse permeate every aspect of their lives.

Their abuse has been memorialized and their privacy violated in perpetuity. Victims

interests in this case are self-evident. (Excerpts of their victim impact statements are

attached in Appendix A hereto).

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...............................................C1 of 6

TABLE OF CONTENTS...............................................................................i

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF IDENTIFICATION....................................................1

STATEMENT OF THE ISSUE...................................................................2

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT ...............................................................................................3

    I.    THE CONTEXT OF ONLINE CHILD SEXUAL EXPLOITATION IS A
        COMPELLING HUMANITARIAN CRISIS THAT MUST BE GIVEN DUE
        CONSIDERATION WHEN ASSESSING ISP LIABILITY UNDER § 230
        OF THE CDA ......................................................................................3

        A.    The Online Marketplace for CSAM Has Reached
            Epidemic Proportions.................................................4

        B.    CSAM Victims Suffer Significant Short-and Long-Term
            Harms .........................................................................6

    II.    THE DISTRICT COURT'S DECISION, IF ADOPTED, WOULD
        EVISCERATE DECADES OF LEGISLATIVE ENACTMENTS THAT
        HAVE SOUGHT PROTECTION, ACCOUNTABILITY, AND JUSTICE FOR
        VICTIMS OF SEXUAL EXPLOITATION AND ABUSE..................................8

        A.    Section 230 of the CDA Was Never Intended to Immunize
            ISPs That Facilitate and Profit from Child Sexual
            Exploitation ...............................................................9

        B.    Congress Passed the TVPA and TVPRA to Expand the
            Scope of Liability for Those Involved in Sex Trafficking .......11

     C.     Congress Passed Masha's Law to Provide Redress for Victims of CSAM ...................................................................13

     D.     Congress Passed FOSTA to Clarify That Section 230 Immunity Does Not Apply to ISPs that Facilitate and Profit from CSAM Hosted and Trafficked on Their Platforms ................................................................................15

III.    THE DISTRICT COURT'S APPLICATION OF AN ACTUAL KNOWLEDGE STANDARD UNDERMINES FOSTA'S REMEDIAL PURPOSE AND DENIES VICTIMS THE OPPORTUNITY FOR DISCOVERY ..........................................................................18

CONCLUSION ......................................................................................21

CERTIFICATE OF COMPLIANCE........................................................22

CERTIFICATE OF FILING AND SERVICE .........................................23

APPENDIX A:

     EXCERPTS FROM VICTIM IMPACT STATEMENTS .............................1

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## <u>CASES</u>

<u>Ashcroft v. Free Speech Coalition</u>,
 535 U.S. 234 (2002)........................................................................14

<u>CYBERsitter, LLC v. Google, Inc.</u>,
 905 F. Supp. 2d 1080 (C.D. Cal. 2012) ...........................................19

<u>Doe v. Mindgeek II</u>,
 2021 WL 5990195 ............................................................................18

<u>Fair Hous. Council of San Fernando Valley v. Roommates.com</u>,
 521 F.3d 1157 (9th Cir. 2008) .........................................................10

<u>Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC</u>,
 141 S. Ct. 13 (2020)..........................................................................19

<u>New York v. Ferber</u>,
 458 U.S. 747 (1982)..........................................................................14

<u>Osborne v. Ohio</u>,
 495 U.S. 103 (1990)..........................................................................14

<u>United States v. Williams</u>,
 444 F.3d 1286 (11th Cir. 2006) ..........................................................8

## <u>STATUTES</u>

18 U.S.C. § 1591 ................................................................... 2, 16, 18

18 U.S.C. § 1595 ............................................................. 2, 11, 16, 18

18 U.S.C. § 1595(a) .................................................................. 11, 12

18 U.S.C. § 2255 ............................................................. 2, 13, 14, 15

18 U.S.C. § 2255(a) ......................................................................... 2

47 U.S.C. § 230 ..................................................................................... *passim*

47 U.S.C. § 230(e)(1) ..............................................................................2, 11

47 U.S.C. § 230(e)(5)(A) .................................................................. 11, 16, 18

Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587 (2006) ........................................................13

Pub. L. No. 106-386, 114 Stat. 1464 (Oct. 28, 2000) ..............................11

Pub. L. No. 108-193, § 4(a)(4)(A) ...........................................................11

Pub. L. No. 115-164 § 4, 132 Stat. 1253 .................................................17

Pub. L. No. 115-572 ..................................................................................17

Pub. L. No. 501(1)(A), 120 Stat. 623 ......................................................13

Pub. L. No. 501(2)(C), 120 Stat. 624 .......................................................13

## **RULE**

Fed. R. App. P. 29(a) .................................................................................1

## **OTHER AUTHORITIES**

141 Cong. Rec. (daily ed. Aug. 4, 1995). (statement of Rep. Goodlatte) ...............10

141 Cong. Rec. S8087 (daily ed. June 9, 1995) (statement of Sen. Exon)...............9

141 Cong. Rec. S8089 (daily ed. June 9, 1995) (statement of Sen. Exon)...............9

141 Cong. Rec. S8345 (daily ed. June 14, 1995) (commentary by Sen. Coates)....10

164 Cong. Rec S 1827 (Sen. McCaskill). .................................................20

164 Cong. Rec. H 1290 (Feb. 27, 2018) (Jackson Lee)................................... 16, 18

164 Cong. Rec. S 1827 (Mar. 20, 2018) (Sen. Blumenthal). ................17-18, 20-21

*Backpage.com's Knowing Facilitation of Online Sex Trafficking*: Hearing 1Before the Subcomm. on Investigations of the S. Comm. On Homeland Security & Governmental Affairs, 115th Cong. (2017) .......................................16

BESSEL VAN DER KOLK, THE BODY KEEPS THE SCORE: BRAIN, MIND, AND BODY IN THE HEALING OF TRAUMA (Viking 2014) ................................................6

CENTERS FOR DISEASE CONTROL AND PREVENTION, NATIONAL CENTER FOR INJURY PREVENTION AND CONTROL, DIVISION OF VIOLENCE PREVENTION, PREVENTING SEXUAL VIOLENCE (last reviewed by the CDC on Jan. 17, 2020), available at https://www.cdc.gov/violenceprevention/sexual violence/fastfact.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.go v%2Fviolenceprevention%2Fsexualviolenc e%2Fconsequences.html..................6

Craig Timberg, YouTube Says It Bans Preteens But Its Still Delivering Troubling Content to Young Children, THE WASHINGTON POST (Mar. 14, 2019), available at https://www.washingtonpost.com/technology/2019/ 03/14/youtube-says-it-bans-preteens-its-site-its-still-delivering-troubling-content-young-children/.......................................................................20

Danielle Citron & Benjamin Wittes, The Internet Won't Break, 86 FORDHAM L. REV. 401 (2017).........................................................................15

ECPAT International. (2018). Trends in online child sexual abuse material Bangkok: ECPAT International...............................................................5

EUR. PARLIAMENTARY RSCH. SERV., CURBING THE SURGE IN ONLINE CHILD ABUSE: THE DUAL ROLE OF DIGITAL TECHNOLOGY IN FIGHTING AND FACILITATING ITS PROLIFERATION 2 (Nov. 2020), https://www.europarl.europa.eu/RegData/etudes/BRIE/2020/659360/EPR S_BRI(2020)659360_EN.pdf ...............................................................4

H. Rep. No. 115-572 ..........................................................................17

H.R. Conf. Rep. 104-458 (1996)............................................................10

H.R. Rep. No. 115-572 (2018) (emphasis added) ....................................17

James R. Marsh, Masha's Law: A Federal Civil Remedy for Child Pornography Victims, 61 SYRACUSE L. REV. 459 (2011) .............................. 13-14

Kathleen Kim & Kusia Hreshchyshyn, <u>Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons in the United States</u>, 16 HASTINGS WOMEN'S L.J. 1 (2004) ..................................................................12

Leonard, M.M., '<u>I did what I was directed to do but he didn't touch me</u>': <u>The impact of being a victim of internet offending</u>, 16 J. OF SEXUAL AGGRESSION 249, 254 (2010) ...........................................................................7, 8

Michael H. Keller & Gabriel J.X. Dance, <u>The Internet Is Overrun With Images of Child Sexual Abuse. What Went Wrong?</u>, NYTIMES.COM (Sep. 2019), available at https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html?msclkid=531b2a24a55511ec9733999ed45d40bd ........................... 4-5

NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, CHILD PORNOGRAPHY POSSESSORS ARRESTED IN INTERNET-RELATED CRIMES: FINDINGS FROM THE NATIONAL JUVENILE ONLINE VICTIMIZATION STUDY, available at http://us.missingkids.com/en_US/publications/NC144.pdf............5, 7

PALMER, T. & STACEY, L., JUST ONE CLICK: SEXUAL ABUSE OF CHILDREN AND YOUNG PEOPLE THROUGH THE INTERNET AND MOBILE PHONE TECHNOLOGY (Barkingside, UK: Barnardo's, 2013).......................................................................8

Steel, J.,et. al., <u>Psychological sequelae of childhood sexual abuse: Abuse-related characteristics, coping strategies and attributional style</u>, 28 CHILD ABUSE AND NEGLECT 785 (2004) ...........................................................8

U.S. DEP'T OF JUSTICE, THE NATIONAL STRATEGY FOR CHILD EXPLOITATION AND PREVENTION AND INTERDICTION (2010), available at http://www.justice.gov/psc/docs/natstrategyreport.pdf .........................................7

U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY: PRODUCTION OFFENSES (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf...................................4

Von Weiler, J., Haardt-Becker, A., & Schulte, S. <u>Care and treatment of child victims of child pornographic exploitation (CPE) in Germany</u>, 16 J. OF SEXUAL AGGRESSION 211, 216 (2010) .......................................................6

Wells, G., Horwitz, J., & Seetharaman, D., <u>Facebook Knows Instagram is</u>
<u>Toxic for Teen Girls, Company Documents Show</u>,
THE WALL STREET JOURNAL ( Sep. 14, 2021), available at
https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-
girls-company-documents-show-11631620739?mod=hp_lead_pos7..................20

## <u>STATEMENT OF IDENTIFICATION</u>

CHILD USA, Rape, Abuse and Incest National Network (RAINN), Carol Hepburn, Esq., and Micha Star Liberty, Esq. are sexual violence and victim advocacy organizations and attorneys with decades of collective experience researching sexual violence and working with victims and survivors; John & Jane Does 1-4 are victims of child sexual abuse and online exploitation that have bravely chosen to speak out about their abuse and the devastating impact it continues to have on their lives. Amici curiae have a strong interest in the outcome of this case and believe their expertise and experience in this area will be of assistance to the Court. The complete statements of amici curiae are provided in the Statements of Interest of Amici Curiae and excerpts from the victim impact statements of John & Jane Does 1, 2, 3, & 4 are provided in Appendix A.

Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and all parties to the appeal have consented to the filing of this brief.

Counsel for the Appellant did not author the brief in whole or in part. Neither Appellants nor Appellants' counsel contributed financial support intended to fund the preparation or submission of this brief. No other individual(s) or organization(s) contributed financial support intended to fund the preparation or submission of this brief.

## STATEMENT OF THE ISSUE

Whether the District Court erred by finding that Section 230 immunity under the Communications Decency Act, 47 U.S.C. § 230, applies to Internet Service Providers (ISPs) so as to bar Plaintiff-Appellant's causes of action under 18 U.S.C. §§ 2255 and 1595.

## SUMMARY OF THE ARGUMENT

Sex trafficking and the production and distribution of child sexual abuse material ("CSAM") are rapidly growing problems in the United States—ones that irreparably harm not only victims but also society. For decades, these heinous crimes have been brazenly enabled by the online platforms like Omegle that have escaped liability under the judicially manufactured Section 230 de-facto immunity regime. Likewise, the District Court's broad interpretation of Section 230 immunity ignores, and is inconsistent with, legislative efforts to combat child exploitation and sex trafficking. Indeed, the plain language of Section 230 contains an explicit exemption from immunity for violations of child sexual exploitation laws under Chapter 110. 47 U.S.C. § 230(e)(1). This exemption includes private rights of action by victims of child pornography and child sex trafficking. See, 18 U.S.C. § 2255(a); 18 U.S.C. §§ 1591 and 1595. The immunity afforded to Defendant in this case is not only irreconcilable with language of the CDA itself, but also with the over two decades of legislative enactments aimed at combatting sex trafficking, protecting children

2

from exploitation, and ensuring accountability for those who financially benefit from such crimes. Simply put, Congress did not intend to bar private rights of action against ISPs for sexual exploitation of children. The District Court decision is antithetical to Congressional directives and, if adopted, would deprive Plaintiff-Appellant—and future CSAM victims—the access to justice that Congress has so clearly promised.  It would do so without providing Plaintiff-Appellant the benefit of any fact- finding that would show that Omegle knowingly places its own profits above the safety of our most vulnerable members of society. Amici therefore respectfully submits that this Court reverse the decision below to ensure that victims of companies like Omegle that knowingly, or recklessly, aid their abusers are not unfairly shut-out of court.

## **ARGUMENT**

## I.    **THE CONTEXT OF ONLINE CHILD SEXUAL EXPLOITATION IS A COMPELLING HUMANITARIAN CRISIS THAT MUST BE GIVEN DUE CONSIDERATION WHEN ASSESSING ISP LIABILITY UNDER § 230 OF THE CDA**

The history of online child sexual exploitation and trafficking shows that the tech industry and specifically ISP's like Omgele have been largely unwilling to prioritize child safety over profits–a position that the District Court has tacitly endorsed by granting Defendant's immunity from liability for their own illegal conduct. Such a broad grant of immunity ensures that the marketplace for CSAM

3

will only continue to grow to the detriment of current victims, future children, and society.

## A. The Online Marketplace for CSAM Has Reached Epidemic Proportions

The expansion of the internet and widespread use of mobile digital technologies together have facilitated an explosive growth in the online marketplace for the production and trafficking of CSAM. At any given time, there are at least one million child sex offenders searching for CSAM online. EUR. PARLIAMENTARY RSCH. SERV., CURBING THE SURGE IN ONLINE CHILD ABUSE: THE DUAL ROLE OF DIGITAL TECHNOLOGY IN FIGHTING AND FACILITATING ITS PROLIFERATION 2 (Nov. 2020), https://www.europarl.europa.eu/RegData/etudes/BRIE/2020/659360/ EPRS_BRI(2020)659360_EN.pdf. Indeed, online exploitation and abuse of children has increased by 422% over the last 15 years. U.S. SENT'G COMM'N, FEDERAL SENTENCING OF CHILD PORNOGRAPHY: PRODUCTION OFFENSES 3 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf. Millions of individual users consume more than 15 million child sexual abuse images in a market currently valued between $3 and $20 billion dollars annually. Michael H. Keller & Gabriel J.X. Dance, The Internet Is Overrun With Images of Child Sexual Abuse. What Went Wrong?, NYTIMES.COM (Sep. 2019), available at https://www.nytimes.com/interactive/2019/09/28/us/child-sex-abuse.html?msclkid

=531b2a24a55511ec9733999ed45d40bd. Unfortunately, there are no signs that the market is slowing down.

Before the digital age, CSAM could only be shared physically thus making it risky to find, and costly to produce and duplicate. Today, the availability of encrypted messaging platforms, peer to peer networks, and the like have made it easier and cheaper for perpetrators to produce CSAM and to connect, collaborate and exchange such materials with individual users—and to do so with virtual anonymity. Id. Tragically, the demand for CSAM has reached epidemic proportions in recent years. The COVID-19 crisis created a "perfect storm" for CSAM to proliferate as children spent more, often unsupervised, time online.  In 2020, 65.4 million images and video files of CSAM were reported to the National Center for Missing and Exploited Children's ("NCMEC") CyberTipline, the highest number of reports ever received in a single year. *Overview*. (2020). National Center for Missing and Exploited Children. https://www.missingkids.org/gethelpnow/cybertipline.  As of 2018, there was a backlog of millions of suspected CSAM images and videos in need of review while police reported being overwhelmed by the increase in overall cases *and* the increased volume and severity of CSAM in each case. ECPAT International. (2018). Trends in online child sexual abuse material. Bangkok: ECPAT International. 32. Given the recent increases in online CSAM activity during the pandemic that backlog has likely expanded.

## B. CSAM Victims Suffer Significant Short-and Long-Term Harms

The trauma stemming from child sexual abuse is complex and individualized, and it impacts victims both in the short-term and throughout their lifetimes. See generally, BESSEL VAN DER KOLK, THE BODY KEEPS THE SCORE: BRAIN, MIND, AND BODY IN THE HEALING OF TRAUMA (Viking 2014). Child sexual abuse takes a significant toll on victims' overall health, increasing the risk not only for depression, anxiety, substance abuse, post-traumatic stress disorder (PTSD), and suicidal ideation, but also physical ailments such as high blood pressure and chronic illness. See CENTERS FOR DISEASE CONTROL AND PREVENTION, NATIONAL CENTER FOR INJURY PREVENTION AND CONTROL, DIVISION OF VIOLENCE PREVENTION, PREVENTING SEXUAL VIOLENCE (last reviewed by the CDC on Jan. 17, 2020), available at https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fviolenceprevention%2Fse xualviolenc e%2Fconsequences.html. The paradigm shift from tangible to digital CSAM has exacerbated these effects. Von Weiler, J., Haardt-Becker, A., & Schulte, S. Care and treatment of child victims of child pornographic exploitation (CPE) in Germany, 16 J. OF SEXUAL AGGRESSION 211, 216 (2010). A victim's mere knowledge of the presence and distribution of their abusive imagery causes intense feelings of shame, humiliation, and powerlessness. Id. As explained by NCMEC, "[o]nce these images are on the Internet, they are irretrievable and can continue to

6

circulate forever. The child is re-victimized as the images are viewed again and again." NATIONAL CENTER FOR MISSING & EXPLOITED CHILDREN, CHILD PORNOGRAPHY POSSESSORS ARRESTED IN INTERNET-RELATED CRIMES: FINDINGS FROM THE NATIONAL JUVENILE ONLINE VICTIMIZATION STUDY, available at http://us.missingkids.com/en_US/publications/NC144.pdf. Sadly, these feelings usually persist and even intensify over time over time. U.S. DEP'T OF JUSTICE, THE NATIONAL STRATEGY FOR CHILD EXPLOITATION AND PREVENTION AND INTERDICTION, 11 at D-12 (2010), available at http://www.justice.gov/psc/docs/natstrategyreport.pdf (finding that almost ninety-five percent of CSAM victims suffer lifelong psychological damage and may never overcome the harm, even after lifelong therapy). The problem has taken on a new dimension as CSAM involves increasingly younger victims and is becoming more violent and graphic over time. ID.

In addition to the permanence of the imagery, CSAM victims are also traumatized by their reach. Many victims whose images have been distributed online experience debilitating anxiety about who has seen the images (i.e., family members, coworkers) and preoccupation with the context and motives of their viewing. Leonard, M.M., '_I did what I was directed to do but he didn't touch me': The impact of being a victim of internet offending_, 16 J. OF SEXUAL AGGRESSION 249, 254 (2010). The most difficult part of their revictimization is victims' knowledge that

their images may be used to groom future victims as a way to normalize the abusive behavior. Id. Often, perpetrators strategically produce CSAM in which victims are seen smiling leading victims to worry that others will assume their enjoyment or implicate them in the abuse. PALMER, T. & STACEY, L., JUST ONE CLICK: SEXUAL ABUSE OF CHILDREN AND YOUNG PEOPLE THROUGH THE INTERNET AND MOBILE PHONE TECHNOLOGY (Barkingside, UK: Barnardo's, 2013) . In fact, it is common for victims to feel as they though they were an active participant in their abuse, which in turn contributes to a range of psychological difficulties. Steel, J.,et. al., Psychological sequelae of childhood sexual abuse: Abuse-related characteristics, coping strategies and attributional style, 28 CHILD ABUSE AND NEGLECT 785 (2004). These worries are not entirely unjustified; indeed, the possession and viewing of CSAM enlarges the market and results in further exploitation and sexual abuse of children. See, e.g., United States v. Williams, 444 F.3d 1286, 1290 (11th Cir. 2006) ("Our concern is not confined to the immediate abuse of the children depicted in these images but is also to enlargement of the market and the universe of this deviant conduct that, in turn, results in more exploitation and abuse of children.").

## II. THE DISTRICT COURT'S DECISION, IF ADOPTED, WOULD EVISCERATE DECADES OF LEGISLATIVE ENACTMENTS THAT HAVE SOUGHT PROTECTION, ACCOUNTABILITY, AND JUSTICE FOR VICTIMS OF SEXUAL EXPLOITATION AND ABUSE

Over two decades of legislative efforts have made clear that the CDA was never intended to limit civil liability for crimes related to CSAM and child sex

trafficking. The District Court's decision fails to reconcile the purpose of the immunity provided by the CDA with that of the TVPRA to criminalize sex trafficking, or that of Masha's Law to address the revictimization that victims experience when their abusive imagery is redistributed–both of which were intended to provide victims access to justice. If the District Court's reasoning is accepted, it would eviscerate the protections of FOSTA and allow Omegle to continue profiting from the sexual exploitation of children.

### A.    Section 230 of the CDA Was Never Intended to Immunize ISPs That Facilitate and Profit from Child Sexual Exploitation

Congress passed the CDA in 1996 for the clear purpose of ensuring that the internet, then in its infancy, would be "**a safe place for our children and our families.**" 141 Cong. Rec. S8087 (daily ed. June 9, 1995) (statement of Sen. Exon) (emphasis added).  The same interest in protecting children prompted Congress to enact the amendment titled "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material," that eventually became Section 230 of the CDA. See, e.g., 141 Cong. Rec. S8089 (daily ed. June 9, 1995) (statement of Sen. Exon) ("The heart and the soul of the Communications Decency Act are its protection for families and children."). More precisely, Section 230 was intended to serve two purposes: 1) to eliminate barriers to the development and use of technologies that would "empower[ing] parents to determine the content of communications their children receive through interactive computer services" by absolving providers of

liability for their "good faith" attempts at  restricting user access to obscene and indecent materials on their platforms; and 2) to limit federal regulation of the internet which members were concerned would stymie innovation. 141 Cong. Rec. (daily ed. Aug. 4, 1995). (statement of Rep. Goodlatte); H.R. Conf. Rep. 104-458 at 194 (1996).

There is nothing in the language of Section 230 that creates the kind of sweeping immunity for all online misconduct imputed by the decision below. To the contrary, the legislative history suggests that Congress wanted to retain liability for entities with knowledge of illegal conduct and others acting in bad faith. See, e.g., 141 Cong. Rec. S8345 (daily ed. June 14, 1995) (commentary by Sen. Coates) (explaining that the CDA permitted liability for "someone who, among other things, manages the prohibited or restricted material, charges a fee for such material, provides instructions on how to access such material or provides an index of the material) (*emphasis added*).

Section 230 merely provides a *limited defense* from liability for providers who monitor for objectional material, but in good faith fail to capture all harmful content on their platforms. Fair Hous. Council of San Fernando Valley v. Roomates.com, 521 F.3d 1157, 1164 (9th Cir. 2008). Moreover, the plain language of the statute contains two key exceptions: (1) that it shall have "no effect on criminal law" including chapter 110 of Title 18 (relating to sexual exploitation of children ) or "any

other Federal criminal statute" 47 U.S.C. § 230(e)(1); and (2) that "[n]othing in this section shall be construed to impair…any claim in a civil action brought under 18 § 1595 . . ."(relating to sex trafficking). 47 U.S.C. § 230(e)(5)(A).

Therefore, the District Court's interpretation of Section 230 immunity conflicts with the statute's plain text and subverts the law's purpose of protecting children online.  Considering the District Court's departure from this principle, this Court must reverse the decision below to realign judicial interpretation with Congress's overriding policy objectives.

### B.    Congress Passed the TVPA and TVPRA to Expand the Scope of Liability for Those Involved in Sex Trafficking

By the 20th century, online sex-trafficking was ubiquitous. To combat the proliferation of this "modern day slavery," Congress passed the Trafficking Victims Protection Act ("TVPA")—the first federal law to independently recognize child sex trafficking as a crime. Pub. L. No. 106-386, 114 Stat. 1464, 1486–88 (Oct. 28, 2000). Since federal recognition of sex trafficking in 2000, Congress has continuously expanded the scope of liability for sex trafficking—first in 2003 through the Trafficking Victims Protection Reauthorization Act ("TVPRA") which allowed victims to bring civil suits against their traffickers and other co-defendants, regardless of whether there was a criminal action arising out of the same facts, and again in 2008 by amending the TVPRA to expand criminal and civil liability beyond mere perpetrators. P.L. 108-193, § 4(a)(4)(A);18 U.S.C. § 1595(a). That is, the

11

TVPRA permits two distinct causes of action—perpetrator claims against an individual who directly violates the criminal trafficking statute, and beneficiary claims against a person or entity who may not be liable as a direct perpetrator but who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person **knew or should have known** has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). (**emphasis added**).

When Congress passed the TVPRA, it was focused on empowering victims and giving them a sense of agency over their case. See Kathleen Kim & Kusia Hreshchyshyn, <u>Human Trafficking Private Right of Action: Civil Rights for Trafficked Persons in the United States</u>, 16 HASTINGS WOMEN'S L.J. 1, 17 (2004). The expansion was intended to create pathway for victims to bring civil suits against ISPs like Omegle that facilitate and profit from the trafficking of CSAM on their platform.

Unfortunately, courts have struggled to reconcile the purpose of the immunity provided by Section 230 of the CDA, which predates the TVPRA, with the broad remedial purpose of the TVPRA. The District Court's decision epitomizes the most common outcome of such uncertainty—victims are completely barred from seeking judicial relief against third-party beneficiaries of their abuse.

## C.    Congress Passed Masha's Law to Provide Redress for Victims of CSAM

Congress recognized the harmful impact of CSAM when it passed the Adam Walsh Child Protection and Safety Act of 2006. Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006). In so recognizing, Congress emphasized that "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse", Id., and that "[t]he illegal production, transportation, distribution, receipt, advertising and possession of child pornography. . . is harmful to the physiological, emotional and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole." § 501(1)(A), 120 Stat. at 623. Finally, it declares that "[t]he government has a compelling State interest in protecting children from those who sexually exploit them, and this interest extends to stamping out the vice of child pornography **at all levels in the distribution chain**." § 501(2)(C), 120 Stat. at 624 (**emphasis added**).

Notably, Masha's Law, which gives CSAM victims the right to sue not only those who initially produced the abusive material but also those who perpetuate the exploitation by possessing and distributing their abusive imagery, was incorporated into the Adam Walsh Child Protection and Safety Act. 18 U.S.C. § 2255. Congress passed Masha's Law to address the revictimization of child exploitation victims when their images are redistributed. James R. Marsh, Masha's Law: A Federal Civil

Remedy for Child Pornography Victims, 61 SYRACUSE L. REV. 459, 460 (2011). To prevail under Masha's Law, a victim need only establish that the defendant committed a federal "child pornography" or child exploitation crime, and that they suffered personal injury as a result. 18 U.S.C. § 2255. It permits victims to seek redress without distinguishing between individuals and entities such as ISPs. The legislation's history together with the lack of any exclusionary language in the statute is evidence of Congress's intent that victims be compensated, not only by direct perpetrators of their sexual abuse and exploitation, but also by distributors, receivers, and facilitators of their CSAM, including ISPs.

The value in tackling the whole "distribution chain" of CSAM is also reflected in U.S. Supreme Court precedent. See, e.g., Osborne v. Ohio, 495 U.S. 103, 107 (1990); Ashcroft v. Free Speech Coalition, 535 U.S. 234, 249 (2002). Recognizing the severity of such offenses and the States interest in protecting the wellbeing of children, the Supreme Court went so far as to carve-out an exception to First Amendment protections for the production and distribution of child pornography. See generally, New York v. Ferber, 458 U.S. 747 (1982). The Ferber Court extensively discussed the unique harms borne by CSAM victims by creating "a permanent record of the children's participation," the effects of which are "exacerbated by its circulation." Ferber, 458 U.S. at 759. This rationale–that the very existence of CSAM harms the victim–suggests that the possessor of such materials

injures the child, even if the possessor did not directly perpetrate the abuse themselves, and even if that possessor is an ISP like Omegle.

Between Congress's intent for Masha's Law to have a broad remedial reach and the Supreme Court's affirmation of the harms of CSAM borne by their victims and society, it is evident that Section 230 was never intended to exempt from accountability ISPs who facilitate and profit from such horrendous crimes, particularly where no such exemption exists in the plain language of the statute. Therefore, this Court should permit Plaintiff-Appellant to pursue their claims under § 2255 against Omegle consistent with congressional intent to eliminate obstacles to victims' ability to obtain relief and with the State's compelling interest in the protection of children.

### D. Congress Passed FOSTA to Clarify That Section 230 Immunity Does Not Apply to ISPs that Facilitate and Profit from CSAM Hosted and Trafficked on Their Platforms

In the years following the passage of TVPRA, websites hosting or profiting from sex trafficking content increasingly turned to Section 230 to shield themselves form criminal or civil liability. Danielle Citron & Benjamin Wittes, The Internet Won't Break, 86 FORDHAM L. REV. 401, 404 (2017). The most prolific violator, the now defunct Backpage.com, had been so successful in utilizing Section 230 as a defense against liability for their knowing facilitation of child sex-trafficking through their posting and advertising procedures, that Congress launched a formal

investigation into the problem. See *Backpage.com's Knowing Facilitation of Online Sex Trafficking*: Hearing Before the Subcomm. on Investigations of the S. Comm. On Homeland Security & Governmental Affairs, 115th Cong. (2017). Although Section 230 was supposed to encourage self-regulation, Congress found that many websites had instead become "reckless" in allowing for the sex trafficking of children on their platforms and that website owners did little to prevent it. *Id*. It was in direct response to this egregious misapplication of Section 230 immunity that Congress passed FOSTA in 2018. With the desire to ensure websites like Backpage could not use Section 230 as a shield for its own illegal conduct, FOSTA amended Section 230 to include an express exemption from claims under the TVPRA to the broad immunity created by the CDA. 47 U.S.C. § 230(e)(5)(A) ("Nothing in this section . . . shall be construed to impair or limit . . . any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title"). Through this exception, Congress intended to restore victims' access to justice and hold tech companies accountable when they knowingly or negligently ignore trafficking on their websites. 164 Cong. Rec. H 1290, 1295 (Feb. 27, 2018) (McMorris Rodgers). As Congress clarified, Section 230 "does not prohibit the enforcement against providers and users of interactive computer services of Federal and State criminal and civil law relating to sexual exploitation of children or sex trafficking" because it "was never intended by

16

Congress to provide legal protection to websites that unlawfully promote and facilitate prostitution and contribute to sex trafficking." H.R. Rep. No. 115-572 (2018) (emphasis added). See also, Pub. L. No. 115-164 § 4, 132 Stat. 1253, 1254 (header: "ensur[e] ability to enforce federal and state criminal and civil law relating to sex trafficking") (emphasis added).

Although Backpage was one impetus for Congressional investigation, neither the language of FOSTA nor its legislative history limits its immunity exemption to a particular actor. In fact, Congress explicitly rejected such a limitation, noting that FOSTA would allow "vigorous criminal enforcement against all bad-actor websites, not just Backpage.com, through the creation of a new federal law and by explicitly permitting states to enforce criminal laws that mirror this new federal law and current federal sex trafficking law." H. Rep. No. 115-572, pt. 1, at 5.  FOSTA merely "close[d] the loophole," so that victims could "bring to justice" to online platforms that were found to be facilitating online exploitation and abuse. *Id*.

There is simply no indication that Congress intended that an ISP be a criminal perpetrator of sex trafficking or else be immune from liability. To the contrary, Congress was moved by the victims' testimony of their revictimization by the online platforms that refused to remove their imagery, and ultimately rejected amendments that would "protect websites that identify sex trafficking ads and then leave them up in order to continue profiting from them." 164 Cong. Rec. S 1827, 1829

(Blumenthal); see also, 164 Cong. Rec. H 1290, 1292-93 (Feb. 27, 2018) (Jackson Lee).

The fact that Omegle profits from the illegal content posted on its online platform rather than through some other medium, does not exempt it from all liability for its *own criminal activity*. FOSTA was passed to prevent precisely such an argument.

## III. The District Court's Application  of An Actual Knowledge Standard Undermines FOSTA's Remedial Purpose And Denies Victims the Opportunity For Discovery

Despite the passage of FOSTA, the District Court rewrote Section 230(e)(5)(A) to effectively eliminate § 1595 beneficiary liability claims against online platforms like Omegle by holding that a plaintiff bringing such a claim against an ISP must plead that the ISP itself violated § 1591, and applying § 1591's criminal mens rea standard to those claims, even though the constructive knowledge standard is explicitly written into § 1595. As Amici explained above, "nothing within the statute's text and structure [ . . . ] suggest anything other than the plainest interpretation of the provision, which is as long as the conduct underlying Plaintiff's Section 1595 claim amounts to a violation of Section 1591, then she may bring the claim alleging the lesser constructive knowledge standard." Doe v. Mindgeek II, 2021 WL 5990195, at *9. Indeed, Congress explicitly lowered the requisite mens rea under § 1595 in 2008, and it did so intent on holding third-party beneficiaries

18

like Omegle with constructive knowledge of illegal content on their platforms accountable. Therefore, the District Court's decision completely perverts the law.

The scope of Omegle's constructive knowledge is, or should be, a fact-intensive inquiry; however, the District Court's dismissal of the case at the pre-discovery stage, has all but foreclosed on Plaintiff-Appellant's ability to prove that Omegle knowingly facilitated and benefited from the trafficking of CSAM on their platform. Indeed, courts have recognized the dangers of granting a motion to dismiss based on the CDA's limited immunity defense. See, e.g., CYBERsitter, LLC v. Google, Inc., 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012) ("Because Defendant's entitlement to immunity under the CDA depends on whether Defendant 'developed' or materially contributed to the content of these advertisements, it is too early at this juncture to determine whether CDA immunity applies."). Most recently, U.S. Supreme Court Justice Clarence Thomas bemoaned the use of Section 230 to bar claims from advancing to discovery and urged courts to refrain from "reading extra immunity into statutes where it does not belong." Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC, 141 S. Ct. 13, 15 (2020). See also id. at 18 ("Paring back the sweeping immunity courts have read into § 230 would not necessarily render defendants liable for online misconduct. It simply would give plaintiffs a chance to raise their claims in the first place. Plaintiffs still must prove the merits of their cases, and some claims will undoubtedly fail").

19

Similarly, Congress has recognized the importance of discovery in cases of online sex trafficking, observing that internet companies believed they "would be able to win again in court and deny us our opportunity to look at the documents and to look at the underlying evidence that one should always look at in an investigation." 164 Cong. Rec S 1827, 1830 (Sen. McCaskill).

Without the ability to engage in discovery, there will be no serious consideration of how much Omegle knew about the likelihood of harm to children accessing its platform. This is especially important given the sophisticated algorithms implemented by online platforms that prioritize user engagement and profitability, often at the expense of children's safety. See, e.g., Wells, G., Horwitz, J., & Seetharaman, D., Facebook Knows Instagram is Toxic for Teen Girls, Company Documents Show, THE WALL STREET JOURNAL (Sep. 14, 2021), https://www.wsj.com/articles/facebook-knows-instagram-is-toxic-for-teen-girls-company-documents-show-11631620739?mod=hp_lead_pos7; Craig Timberg, YouTube Says It Bans Preteens But Its Still Delivering Troubling Content to Young Children, THE WASHINGTON POST (Mar. 14, 2019), https://www.washingtonpost.com/technology/2019/03/14/youtube-says-it-bans-preteens-its-site-its-still-delivering-troubling-content-young-children/.

Congress has unequivocally declared its intention that victims of sex trafficking — frequently vulnerable children — have their day in court. 164 Cong.

Rec. S 1827 (Mar. 20, 2018) (Sen. Blumenthal). By cutting off Plaintiff-Appellant's opportunity to gather evidence into Omegle's practices, the District Court has completely undermined the purpose of FOSTA, and denied them the access to justice Congress so plainly promised. Moreover, the District Court decision, if adopted, would provide a shield to powerful internet companies, while leaving the most vulnerable members of society powerless and exposed online.

## **CONCLUSION**

For all the foregoing reasons, amici respectfully request that this Court vacate the district court's order dismissing this case and remand this matter for a determination on the merits.

Respectfully submitted,

/s/ Vivek Jayaram
Vivek Jayaram, Esq.

Vivek Jayaram
Elizabeth Austermuehle
Jayaram Law
125 S. Clark Street
Suite 1175
Chicago, IL 60603
Tel: 646-325-9855
Tel: 312-736-1227
Vivek@jayaramlaw.com
Liz@jayaramlaw.com
*Counsel for Amici Curiae*

Marci A. Hamilton, Esq.
CEO & Founder, CHILD USA
3508 Market Street, Suite 202
Philadelphia, PA 19104
Tel: (215) 539-1906
mhamilton@childusa.org

Jessica Schidlow, Esq.
Staff Attorney, CHILD USA
jschidlow@childusa.org

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because the brief contains **4,664** words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface 14-point Times New Roman font using Microsoft Word Version 16.

Dated:  March 21st 2022
      Chicago, IL

/s/ Vivek Jayaram
Vivek Jayaram
*Counsel for Amici Curiae*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on March 21, 2022.

All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  March 21, 2022
           Chicago, IL

/s/ Vivek Jayaram
Vivek Jayaram
*Counsel for Amici Curiae*

## APPENDIX A: EXCERPTS FROM VICTIM IMPACT STATEMENTS

JOHN DOE:

I write to you in representation of not only myself, but the many souls from past and present, that either refuse to come forward, can no longer come forward due to a condition of slavery, or because the worst has already befallen them.

**I hope to impress upon you the widespread nature and the severity of sexual abuse, not just its initial impacts, but the never-ending impact that is carried by the spread of online media containing it.**

I am only one man, but I promise you, I am the voice of many. Like so many others, at a very young age I was abused by a man that ingratiated himself into my family unit as a man of high moral character that seemed only to be trying to help. . . . . . . One would think that this initial abuse was bad enough and that there could not possibly be anything worse that could happen to a person. That thought is wrong. During the span of my captivity and abuse, the man responsible decided to film and photograph some of the abuse he perpetrated against me. . . . .[B]ecause I was helpless to defend myself I was forced to do unspeakable things…It does not end there unfortunately. It turns out, this media depicting my abuse has been spread throughout the world on a mass scale. … This occurrence, I assure you, is as bad, or worse, than the abuse I underwent initially.

**I now have to relive these events forever, like a skipping vinyl record on the record-player of eternity, this sad song plays over and over. I am a prisoner.**

When I began college, at least for the first 2 semesters or so, I was adamant on trying to get a degree and make a better life for myself. One day however, I received a letter in the mail from the DoJ (Department of Justice). It asked me if I wanted to be made aware of ongoing criminal cases involving me so that I may pursue restitution. At this time I wasn't aware of what I was getting into by telling them "yes" . . . What happened next almost led me to my death. I started to receive dozens of letters weekly, stating that I was victimized by child exploitation and distribution of media containing my initial abuse. They were from every state and from multiple countries around the world (US military bases from Japan, Germany, etc). My abuse was everywhere, and now I knew it. I had always feared this moment. . . .  thousands exposing me to thousands more. . . . I began taking Oxycontin, Xanax, ecstasy, and drinking heavily. I was so scared, I didn't know what to do to feel safe, so I went back to self-medicating. I could no longer be in large public arenas, like a university, for fear of being recognized, so I dropped out leaving myself in financial debt and without any care or clue as to what to do. I tried getting jobs, but after a short time I would always be fired or I would quit out of anger or fear. . . .  I almost overdosed on multiple occasions, and I flipped my car going 70 mph on a busy highway during

1

traffic. . . . I am in a constant state of anger and fear. This is no way for a person to live.

**I see everyone as a threat to my security, knowing that at any moment someone could bring up pictures and videos of the worst moments of my life and show them to anyone around. I am a slave to a cycle of abuse, helpless in stemming its destruction upon my life. I just want it all to stop.**

I have gained throughout my years of therapeutic studies and my experience being a patient. Almost all therapists or psychologists would agree that the first steps to recovery for any patient involve a catharsis; a type of acknowledgment of what happened and an understanding that they need help, a type of closure of the traumatic experience, putting it in the past where it belongs. The patient also needs to feel safe so that they may express themselves truthfully and freely in the therapeutic relationship. For me, and for anyone who has, or is, enduring the online spread of media containing their abuse, it is almost impossible to reach either of these initial phases of recovery. This is because none of us can find any type of closure when there is a new abuser caught with the pictures or videos of our abuse on an almost daily basis. . . . .

**I believe the real, true help, comes from the courts and the justice systems. You guys are the heroes that give us the ability and resources to help ourselves. You are our fighters in the ring against these wrongdoers. You are the vehicle for change in these dark times.**

The effects of sexual abuse and its spread all over the world have permeated every aspect of my personality, emotions, and every relationship I have ever had. It is an all-consuming darkness that slithers secretly in the underbelly of society. It is time for it to be exposed, brought to the awareness of the masses, and have a light shined on those that choose to hurt children!

**This is the biggest fight of our age.**

JANE DOES 1 & 2:
(Statements made by Mother on behalf of her children)

I have so many concerns regarding the future of my children as a result of continuous repetition of the horrendous abuse they endured while in their biological home, that they continue to face each and every day as people view and pass along pictures and videos of their innocence being taken away.

**Each time someone views this abuse, they re-abuse my children. Pornography is not a victimless crime.**

What a hard letter this is to write when I try to focus on their future, not on their past. I try very hard to teach them that their past and these images do not define their future. We go to therapy at least one day a week, but often more. I emphasize to them that they are good kids. They think that they are bad. The shame of what

2

happened to them affects them daily. They are confused. We teach them over and over that they are innocent and have no reason to feel that shame. Then they share what happened to them with their friends and their friends no longer want to be their friend. They are confused. If they were not bad, why should they hold their past a secret?

**Because it is not their past, it is their present and future. It is a daily occurrence that someone is viewing and passing these photos and videos around. They are being victimized every day. How do you explain that to a child?**

. . . .  I am afraid for them. How will they ever feel safe in the outside world? What if their teachers or college professors recognize them? What if the grocer at the store recognizes them, their boss at their job? . . .

Other kids get to use the Internet. Even in school, the Internet is the turn to resource for this generation of children. Almost all jobs somehow revolve around the Internet. I worry that they will google their names. We all have done it. I worry that they will google their abusers' names. What is going to pop up? Are they ever going to be safe when using the internet?

. . . . We walk forward one step every day and back two. . . . My children have nightmares on a regular basis. They have been known to pinch and hurt themselves. They spend more time than most kids at the doctors with a variety of aches and pains that have no explanation. Their anxiety is through the roof. . . . They cut up and destroy their clothing or their toys. . . .  I worry how their future will be once they realize the true extent of these pictures and videos. I need them to be able to separate themselves from the abuse that happened but the videos and pictures will be constant reminders of it. In order to deal with this is a healthy manner; they need to know that none of this was their fault and that the people possessing the videos, the sharing of the videos, will be held accountable.

**Only by stopping the future spread of these videos do my children have a chance to grow up to be the independent, self-confident adults that they deserve to be.**


JANE DOE 3:

I am a victim of child molestation and rape. I was filmed, photographed and exploited so others could watch. The person who did this to me made it so that not only could he get what he wanted, but so that other pedophiles could share and extend my abuse and rape. They share photos and videos of me, sell them, and keep a succession of my torture going on forever. It never ends. It is never over. It keeps coming back, day after day after day, year after year, and I can never escape it. I have to deal with this on a daily basis.

**Nobody whose images of their rape and torture are on the internet can live normally again.**

3

I find it hard to talk or be around people, including y family. I have wanted to try therapy, but the thought of talking about what is continuing to happen is horrifying in itself. Interactions with people are stressful to me. I constantly wonder if someone I know knows about the videos, or if they don't know, if they will find out. Having photos and video on the internet is sickening. You don't know who has seen them. **When someone's eyes wander too long it's hard not to wonder if they recognize me. Having these images and videos out there for anyone to see makes me wonder all the time who has witnessed my abuse and rape and did nothing but keep and share it.**

 I want to consider vocational rehabilitation, in hopes that I may, some day, be able to have a job, to contribute to the support of my family, but knowing that I could encounter someone who has seen the images of my abuse makes me fear situations where I may be recognized by strangers who have witnessed my abuse.

. . . . .[A]gain at 16 a man 30 years older than me came onto me. He asked for pictures of me! I couldn't believe at 16 another man was trying to exploit me. I broke down and told a fellow employee. He told our boss and the older man was shortly transferred. Had he seen the images and he wanted more? Did he think I would welcome his attention because of what he had seen? I want to try to have a normal life, and I am trying, but I am afraid of being recognized or discovered and exposed, again. I fear talking to strangers, employers, and acquaintances. I fear that someone will recognize me, and that my past could be revealed to everyone around me. **The worst moments of my life are forever being re-played on the internet. That is not the part of me I want people to see and know, and yet, so many people are interested in the worst moments of my life.**

. . . . For the rest of my life, someone will always be looking at me when I was just a little girl. Someone watching, taking advantage of a helpless child to find sexual release from crimes against a child. The biggest horror to me is if someone were to be caught with images of me and not convicted or locked up. I fear that the pedophiles who are searching and finding my images might not be satisfied with just looking at what happened to me, and might go rape and ruin another child. If you have children, like I do, you would know that these people do not change. They cannot be helped. It doesn't affect you until it happens to you or a loved one. I don't trust anyone but my husband with our child. I become overwhelmingly protective of my own children because **I know it can happen to anyone, because it happened to me.**

JANE DOE 4:

I live everyday with the horrible knowledge that many people somewhere are watching the most terrifying moments of my life and taking grotesque pleasure in them. I am a victim of the worst kind of exploitation: child pornography.

**Unlike other forms of exploitation, this one is never-ending.**

Everyday people are trading and sharing videos of me as a little girl being raped in the most sadistic ways. They don't know me, but they have seen every part of me. They are being entertained by my shame and pain.

The world came crashing down the day that I learned pictures of me being sexually abused had been circulated on the Internet. Since then, little has changed except my understanding that the distribution of these pictures grows bigger and bigger by the day. I have always been told that there is nothing I can do about it.

The enormity of this has added to my grief and pain and given me paranoia. I wonder if the people I know have seen these images. I wonder if men I pass in the grocery store have seen them. I feel totally out of control. They are trading around my trauma like treats at a party, and it feels like I'm being raped all over again by every one of them.

. . . .**I can never feel safe as long as my images are out there. Every time they're downloaded I am exploited again, my privacy is breached and I feel in danger again. I fear that any of them may ty to find me and do something to me.**

. . . . It is so hard to put words to unspeakable experiences and pain. I want to have a normal life and put this all behind me, but it just does not end. . . . I also have a constant fear for my children's safety as pedophiles have continued to stalk me over social media and have hacked into my Facebook and Instagram to steal pictures of what I look like now to post on their own anonymous forums. They successfully discovered and posted on one of those forums a former address of ours, so we moved and I shut down my social media accounts. I fear what would happen if they did find out where we live or got a hold of pictures or information about my children considering the efforts that some have gone to as they have continued to stalk me online.

While the abuse from my original abuser was awful, as time goes on, that is farther and farther away from me. He is in jail and can never hurt me, and that is over. The men that download my pictures are all around me for all I know, and this part of my abuse could keep going on forever. I have no control over it at all. This is frightening beyond belief. It impairs my ability to function socially, to have romantic relationships, to participate in social media, and it affects my daily functioning.

. . . . I want you to know that dealing with the effects of the stress of random men looking at pictures of my sex abuse as a child is like a fulltime job, and it wears me down and colors every aspect of my life. We hear more and more now about child exploitation and child pornography. But when you hear about it, please try to remember that we are not talking about an object or an image; we are talking about

little children, like I was, being abused. It's real and it becomes a life-long battle. While I have hope that things will get better and good people will continue to fight this issue and make positive changes, I know this is a struggle I will be fighting in different ways for likely the rest of my life.