NO. 22-10338

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

M.H, J.H., on behalf of their minor child, C.H.,

PLAINTIFFS–APPELLANTS,

V.

OMEGLE.COM LLC.,

DEFENDANT–APPELLEE.

On Appeal from the United States District Court
for the Middle District of Florida
Case No. 8:21-cv-00814-VMC-TGW
(Hon. Virginia M. Hernandez Covington)

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, CENTER FOR DEMOCRACY & TECHNOLOGY, CENTER FOR LGBTQ ECONOMIC ADVANCEMENT & RESEARCH, ENGINE ADVOCACY, FREE SPEECH COALITION, REFRAME HEALTH AND JUSTICE, AND THE SEX WORKERS PROJECT OF THE URBAN JUSTICE CENTER IN SUPPORT OF DEFENDANT–APPELLEE**

Vera Eidelman
*Counsel of Record*
Laura Moraff
Joshua Block
AMERICAN CIVIL
  LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Fl.
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

Jennifer Stisa Granick*
AMERICAN CIVIL
  LIBERTIES UNION
  FOUNDATION
39 Drumm Street
San Francisco, CA 94111

Daniel Tilley
AMERICAN CIVIL
  LIBERTIES UNION
  FOUNDATION OF
  FLORIDA
4500 Biscayne Blvd., Ste. 340
Miami, FL 33137

Samir Jain*
Emma Llansó*
Caitlin Vogus*
CENTER FOR
  DEMOCRACY &
  TECHNOLOGY
1401 K St. NW, Suite 200
Washington, DC 20005

*\* Of counsel*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to 11th Cir. R. 26.1-1 and Fed. R. App. P. 29(a)(4)(A), amici curiae state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Pursuant to 11th Cir. R. 26.1-1, amici curiae certify that the following additional individuals and entities have an interest in the outcome of this appeal:

American Civil Liberties Union (amicus curiae)

American Civil Liberties Union of Florida (amicus curiae)

Center for Democracy & Technology (amicus curiae)

Center for LGBTQ Economic Advancement & Research (amicus curiae)

Eidelman, Vera (Counsel of Record for amici curiae)

Engine Advocacy (amicus curiae)

Free Speech Coalition (amicus curiae)

Reframe Health and Justice (amicus curiae)

The Sex Workers Project of the Urban Justice Center (amicus curiae)

Pursuant to 11th Cir. R. 26.1-2(b), this Certificate includes only those

i

persons and entities omitted from the Certificates contained in Appellant's

Initial Brief and all subsequently filed briefs.

Dated: June 24, 2022                    */s/ Vera Eidelman*
                                        Vera Eidelman
                                        AMERICAN CIVIL LIBERTIES UNION
                                          FOUNDATION
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        (212) 549-2500
                                        veidelman@aclu.org

                                        *Counsel of Record for Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................... i

TABLE OF CONTENTS ................................................................. iii

TABLE OF AUTHORITIES ............................................................. v

STATEMENT OF INTEREST ........................................................... 1

SOURCE OF AUTHORITY TO FILE ..................................................... 4

FED. R. APP. P. 29(a)(4)(E) STATEMENT ............................................ 4

STATEMENT OF THE ISSUE ADDRESSED BY AMICI ...................................... 4

INTRODUCTION & SUMMARY OF ARGUMENT ............................................. 5

ARGUMENT ......................................................................... 9

I.   Serious First Amendment questions would arise if courts were to construe FOSTA to allow civil liability based merely on constructive knowledge ....... 9

II.  Given the realities of how intermediaries moderate content, an actual knowledge standard is critical to ensuring that online expression remains free and robust ................................................................ 14

  A.  Congress enacted Section 230 to foster freedom of expression online, informed by how intermediaries moderate content ............................. 14

  B.  FOSTA has already harmed online speech and online communities ...... 16

  C.  Expanding civil liability under FOSTA to reach less-than-knowing conduct would only exacerbate these problems ................................. 19

    1.  Plaintiffs' interpretation of FOSTA creates a strong incentive for online intermediaries to over-remove user-generated content .......... 20

    2.  Plaintiffs' interpretation of FOSTA could create a perverse incentive for some online intermediaries to deliberately ignore the content posted on their services ..................................... 27

CONCLUSION ................................................................................... 28

CERTIFICATE OF COMPLIANCE ......................................................... 29

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING................................. 30

# TABLE OF AUTHORITIES

## CASES

*Almeida v. Amazon.com*,
456 F.3d 1316 (11th Cir. 2006) .......................................................... 11

*Backpage.com, LLC v. Lynch*,
216 F. Supp. 3d 96 (D.D.C. 2016) ...................................................... 16

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) .......................................... 26

*Bond v. United States*,
572 U.S. 844 (2014) ............................................................................. 9

Compl., *Doe v. The Rocket Sci. Grp. LLC*,
No. 1:19-cv-5393 (N.D. Ga. Nov. 26, 2019) ...................................... 26

*Doe v. Kik Interactive, Inc.*,
482 F. Supp. 3d 1242 (S.D. Fla. 2020) ............................................... 11

*Dowbenko v. Google Inc.*,
582 F. App'x 801 (11th Cir. 2014) ....................................................... 6

*Erotic Serv. Provider Legal Educ. & Rsch. Proj. v. Gascon et al.*,
881 F.3d 792 (9th Cir. 2018) ................................................................ 1

*Ginsberg v. New York*,
390 U.S. 629 (1968) ........................................................................... 10

*J.B. v. G6 Hospitality, LLC*,
No. 4:19-cv-7848, 2020 WL 4901196 (N.D. Cal. Aug 20, 2020)....... 26

*Jones v. Dirty World Entm't. Recordings LLC*,
755 F.3d 398 (6th Cir. 2014) ............................................................. 15

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965) ........................................................................... 20

*Lerman v. Flynt Distrib. Co.*,
745 F.2d 123 (2d Cir. 1984) ............................................................... 11

*M.H. v. Omegle.com LLC*,
   No. 8:21-cv-814, 2022 WL 93575 (M.D. Florida Jan. 10, 2022) .......... 5, 7, 10, 20

*M.L. v. craigslist, Inc.*,
   No. 3:19-cv-6153, 2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) ................. 26

*Manual Enters., Inc. v. Day*,
   370 U.S. 478 (1962) ........................................................................ 13, 14

*Marks v. United States*,
   430 U.S. 188 (1977) ............................................................................... 13

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ............................................................................... 12

*NetChoice, LLC v. Att'y Gen. of Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ........................................................... 1, 6

*Reno v. ACLU*,
   521 U.S. 844 (1997) ........................................................................... 1, 11

*Smith v. California*,
   361 U.S. 147 (1959) ..................................................................... 9, 10, 13

*United States v. Hill*,
   500 F.2d 733 (5th Cir. 1974) ................................................................. 10

*United States v. Linetsky*,
   533 F.2d 192 (5th Cir. 1976) ................................................................. 10

*United States v. New Orleans Book Mart, Inc.*,
   490 F.2d 73 (5th Cir. 1974) ................................................................... 10

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994) ................................................................................. 12

*Video Software Dealers Ass'n v. Webster*,
   968 F.2d 684 (8th Cir. 1992) ................................................................. 21

*Woodhull Freedom Found. v. United States*,
   No. 18-1552 (D.D.C. 2022), *appeal docketed*, No. 22-5105 (D.C. Cir. Apr.
   28, 2022) ............................................................................................... 12

*Zeran v. AOL*,
129 F.3d 327 (4th Cir. 1997) ................................................. 6, 11, 15

**BILLS & STATUTES**

U.S. Code, Title 18

18 U.S.C. § 1591 *et seq.* ..................................................... 7, 16

18 U.S.C. § 1591(a) ........................................................... 6, 16

18 U.S.C. § 1591(e)(4) ......................................................... 16

18 U.S.C. § 1595 ................................................................. 7

18 U.S.C. § 2258A(f) ........................................................... 12

18 U.S.C. § 2421A ............................................................. 16

Section 230 of the Communications Decency Act

47 U.S.C. § 230 *et seq.* ................................................. passim

47 U.S.C. § 230(c)(1) ............................................................ 6

47 U.S.C. § 230(e)(5)(A) ............................................. 7, 8, 16, 28

H.R. 6928, 117th Cong. (2022) ............................................. 17

S. 3758, 117th Cong. (2022) ................................................ 17

S. Rep. No. 115-199 (2018) ................................................. 15

**OTHER AUTHORITIES**

Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, Vice (Jan. 8, 2021) ........................................... 25

Amber Madison, *When Social-Media Companies Censor Sex Education*, The Atlantic (Mar. 4, 2015) ................................................. 25

Carey Shenkman, Dhanaraj Thakur & Emma Llansó, Cent. Dem. & Tech.,
*Do You See What I See*? (May 2021) ........................................... 21, 22

Danielle Blunt & Ariel Wolf, Hacking//Hustling, *Erased: The Impact of*
*FOSTA-SESTA & the Removal of Backpage* (2020) .................................... 18, 19

EJ Dickson, *Why Did Instagram Confuse These Ads Featuring LGBTQ People*
*for Escort Ads?*, Rolling Stone (July 11, 2019) ................................... 24

Gita Jackson, *Tumblr is Trying to Win Back the Queer Audience It Drove Off*,
Vice (May 11, 2021) ........................................................ 23

Helen Holmes, *"First They Come for Sex Workers, Then They Come for*
*Everyone," Including Artists*, Observer (Jan. 27, 2021) ...................... 17

Jake Ketchum & Laura LeMoon, *What Sex Workers Have to Say About HIV*
*After FOSTA/SESTA*, TheBody (July 3, 2018) ................................... 19

Kendra Albert et al., *FOSTA in Legal Context*,
52.3 Columbia Human Rights L. Rev. 1084 (2021) ........................... 17

Kendra Albert, *Five Reflections from Four Years of FOSTA/SESTA*,
Cardozo Arts & Entm't L. J. (forthcoming) ..................................... 18

Lacey-Jade Christie, *Instagram Censored One of These Photos But Not the*
*Other. We Must Ask Why*, Guardian (Oct. 19, 2020) ......................... 23

Lifeway, *Help Students Understand Sexual Purity* .................................. 25

Madeleine Connors, *StripTok: Where the Workers Are V.I.P.s*, N.Y. Times
(July 29, 2021) ............................................................. 24

Mark Hay, *How AI Lets Bigots and Trolls Flourish While Censoring LGBTQ+*
*Voices*, Mic (Mar. 21, 2021) ................................................ 24

Melanie Ehrenkranz, *British Cops Want to Use AI to Spot Porn—But It Keeps*
*Mistaking Desert Pics for Nudes*, Gizmodo (Dec. 18, 2017) ..................... 23

Nafia Chowdhury, Stanford Freeman Spogli Inst. Int'l Studies, *Automated*
*Content Moderation: A Primer* (Mar. 19, 2022) .......................... 21, 22

Natasha Duarte & Emma Llansó, Cent. Dem. & Tech., *Mixed Messages? The*
*Limits of Automated Social Media Content Analysis* (Nov. 28, 2017) ............... 22

Nitasha Tiku, *Craigslist Shuts Personal Ads for Fear of New Internet Law*, WIRED (Mar. 23, 2018) .................................................................. 19

Nosheen Iqbal, *Instagram 'Censorship' of Black Model's Photo Reignites Claims of Race Bias*, Guardian (Aug. 9, 2020) ................................. 23

Omegle, *Terms of Service Agreement* ...................................................... 11

Planned Parenthood, *Teen Council* .......................................................... 25

Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, Verge (Dec. 3, 2018) ................................................................................ 18

Survivors Against SESTA, *Documenting Tech Actions* ........................... 18

Susie Jolly et al., UNESCO, *A Review of the Evidence: Sexuality Education for Young People in Digital Spaces* (2020) ........................................... 25

U.S. Gov't Accountability Off., GAO-21-385, *SEX TRAFFICKING: Online Platforms and Federal Prosecutions* (2021) ....................................... 17

U.S. Gov't Accountability Off., Highlights of GAO-21-385 (2021) ....... 17

Zoe Kleinman, *Fury over Facebook 'Napalm Girl' Censorship*, BBC News (Sept. 9, 2016) ...................................................................................... 21

## STATEMENT OF INTEREST

The **American Civil Liberties Union** (ACLU) is a nationwide, nonprofit, nonpartisan organization dedicated to defending the principles embodied in the Federal Constitution and our nation's civil rights laws. The **ACLU of Florida** is the Florida affiliate of the ACLU. Since its founding in 1920, the ACLU has frequently appeared before the U.S. Supreme Court, this Court, and other federal courts in cases defending Americans' free speech and freedom of association, including their exercise of those rights online. *See, e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *NetChoice, LLC v. Att'y Gen. of Fla.*, 34 F.4th 1196 (11th Cir. 2022) (amici). Through its LGBTQ & HIV Project, the ACLU advocates for the equal rights of lesbian, gay, bisexual, and transgender people, and people living with HIV. The ACLU also works to reform laws that harm sex workers, or discriminatorily target trans sex workers and sex workers of color. *See, e.g. Erotic Serv. Provider Legal Educ. & Rsch. Proj. v. Gascon et al.*, 881 F.3d 792 (9th Cir. 2018) (amici).

The **Center for Democracy & Technology** (CDT) is a non-profit public interest organization. For more than twenty-five years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory

agencies, and courts in support of First Amendment rights on the Internet and other protections for online speech, including limits on intermediary liability for user-generated content.

**Center for LGBTQ Economic Advancement & Research** (CLEAR) is a 501(c)(4) non-profit organization. CLEAR's mission is to empower LGBTQ+ households, organizations, and communities with fair and equal access to LGBTQ+-affirming financial education and services to meet under-served LGBTQ+ financial needs. CLEAR produces research and advocacy around LGBTQ+ consumer issues, including consumer data and privacy issues, promoting LGBTQ+ people's ability to freely and authentically express themselves online using digital platforms, and ensuring their freedom from unfair policies that disproportionately target and exclude content about and created by LGBTQ+ people and communities.

**Engine Advocacy** is a nonprofit technology policy, research, and advocacy organization that bridges the gap between policymakers and startups. Engine works with government representatives and a community of high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship.

**Free Speech Coalition** (FSC) is a non-profit trade and advocacy association defending the rights and freedoms of the adult industry and its

workers. FSC fights for a world in which body sovereignty is recognized, sexual expression is destigmatized and sex work is decriminalized.

**Reframe Health and Justice** (RHJ) is a collective of advocates working at the intersection of harm reduction, criminal-legal reform and healing. RHJ has over 30 years of collective experience specifically focused on the health and safety of sex workers across the country as community organizers, advocates for policy change, service providers and experts offering training and technical assistance. As harm reductionists, RHJ works on developing and disseminating harm reduction tools and information for people who trade sex to combat interpersonal violence, exploitation and trafficking and poor health outcomes.

The **Sex Workers Project of the Urban Justice Center** (SWP) is a national organization that defends the human rights of sex workers by destigmatizing and decriminalizing people in the sex trades through free legal services, education, research, and policy advocacy. As one of the only US organizations meeting the needs of both sex workers and trafficking victims, SWP serves a marginalized community that few others reach.

## SOURCE OF AUTHORITY TO FILE

Counsel for Plaintiffs–Appellants and Defendant–Appellee consent to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## FED. R. APP. P. 29(a)(4)(E) STATEMENT

Amici declare that:

1.  no party's counsel authored the brief in whole or in part;

2.  no party or party's counsel contributed money intended to fund preparing or submitting the brief; and

3.  no person, other than amici, their members, or their counsel, contributed money intended to fund preparing or submitting the brief.

## STATEMENT OF THE ISSUE ADDRESSED BY AMICI

Whether the district court's order granting Defendant–Appellee's motion to dismiss on the grounds that 47 U.S.C. § 230 bars Plaintiffs–Appellants' claim under 18 U.S.C. § 1595 should be affirmed.

## INTRODUCTION & SUMMARY OF ARGUMENT

Online intermediaries play an essential role in facilitating the speech of hundreds of millions of people. In part, they play the role that book, magazine, and video stores and distributors traditionally played in enabling public access to educational information, art, political speech, and more—only at an even more massive scale. Search engines like Google and DuckDuckGo direct people to content; social media sites like Facebook, LinkedIn, and Pinterest allow people to post their own content; and web-infrastructure services like Amazon Web Services and Cloudflare make it possible to access content online.

Omegle is another online intermediary that facilitates third parties' speech and access to information. Unlike platforms such as Twitter, Facebook, or Pinterest that host static posts from their users, Omegle provides chatrooms in which users are anonymously paired with others from across the globe to interact, primarily through live audio and video. *M.H. v. Omegle.com LLC*, No. 8:21-cv-814, 2022 WL 93575, at *1 (M.D. Florida Jan. 10, 2022). The service is meant to be a fun way to connect to and meet new people, and has grown in popularity during pandemic-related lockdowns, today garnering millions of page views a day.[1] As

---

[1] *Omegle*, 2022 WL 93575, at *1; Taylor Lorenz, *Oh, So We're Doing Random Video Chat Again?*, N.Y. Times (Mar. 1, 2021), https://nyti.ms/3bekPWF.

*The New York Times* has reported, "recordings of Omegle videos have helped creators generate content on other platforms and go viral."[2]

Recognizing the importance of online intermediaries and the risks that imposing open-ended liability on them could pose to communication, Congress passed Section 230 of the Communications Decency Act in 1996, 47 U.S.C. § 230 ("Section 230"). The law immunizes interactive computer service providers, including the kinds of intermediaries identified above, from most civil liability and state law criminal charges based on the speech of their users. As this Court and others have recognized, Section 230(c)(1) protects against liability for the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran v. AOL*, 129 F.3d 327, 330 (4th Cir. 1997); *Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014); *see also NetChoice, LLC*, 34 F.4th at 1210 (platform choices about content moderation constitute editorial judgments protected by the First Amendment).

In 2018, Congress amended Section 230 through the Allow States and Victims to Fight Online Sex Trafficking Act/Stop Enabling Sex Traffickers Act ("FOSTA"). FOSTA expanded the existing criminal provisions codified in 18 U.S.C. § 1591(a) and created a new federal crime related to sex trafficking. Most relevant to this case, it also amended Section 230 to permit civil causes of action

---

[2] *Id.*

6

for participating in a sex trafficking venture under 18 U.S.C. § 1595—but only "if the conduct underlying the claim constitutes a violation of [18 U.S.C. § 1591]." 47 U.S.C. § 230(e)(5)(A). Although Section 1595 allows for liability where a participant "knew or should have known" the venture was illegal, Section 1591 requires knowing participation or, for offenses not related to advertising a person for sex trafficking, reckless disregard.

One of the issues in this case is what level of knowledge an intermediary must have to lose immunity under Section 230(e)(5)(A) and thereby be subject to civil liability: constructive knowledge, as under Section 1595, or actual knowledge, as under Section 1591.[3] The court below correctly held that intermediaries cannot be held civilly liable under FOSTA based only on generalized knowledge that sex trafficking occurs on a website. *Omegle*, 2022 WL 93575, at *12.

This Court should uphold that ruling. A contrary ruling imposing liability without actual knowledge of sex trafficking on a platform would raise serious First Amendment questions. Courts have historically recognized that the scienter requirement imposed on intermediaries, including booksellers and distributors, is a constitutional issue, given the unique role these entities play in facilitating speech.

---

[3] Amici write only to address the constitutional concerns that would arise if the Court were to interpret FOSTA to remove Omegle's Section 230 immunity based on an allegation that the company had constructive knowledge of sex trafficking on its service.

Imposing liability on them can have a severe, unconstitutional chilling effect that substantially diminishes the universe of materials available to the public.

The same is equally, if not more, true for online intermediaries, which act as funnels for billions of pieces of content every day. Given the scale of the speech they enable, imposing liability on online intermediaries on the basis of merely constructive knowledge would have disastrous consequences for users: Intermediaries would choose either to remove protected, societally beneficial content, or even whole services, to avoid the threat of liability—thereby depleting the full scope of speech and information available to the public—or they would try to avoid learning about content posted on their services to avoid having even arguably constructive knowledge of illegal content appearing there—thereby foregoing content moderation on their sites.

Plaintiffs' overbroad interpretation of FOSTA would adversely affect Omegle's ability to provide a platform for people to connect, create, perform, record, and share audio and video—as well as the myriad services offered by other interactive computer service providers. The district court's holding that an intermediary's loss of immunity under Section 230(e)(5)(A) cannot be based on constructive knowledge avoids both constitutional problems and dire practical effects. Therefore, this Court should affirm the district court's grant of Omegle's motion to dismiss.

8

## ARGUMENT

**I.    Serious First Amendment questions would arise if courts were to construe FOSTA to allow civil liability based merely on constructive knowledge.**

The principle of constitutional avoidance holds that courts should adopt a statutory construction that avoids "grave and doubtful constitutional questions." *Bond v. United States*, 572 U.S. 844, 869 (2014) (Scalia, J. concurring). Construing FOSTA to allow online intermediaries to face civil liability without any actual knowledge or awareness of sex trafficking occurring on their sites would raise serious First Amendment questions. This Court can and should avoid determining what scienter requirement is robust enough to avoid chilling speech and undermining First Amendment interests by holding that FOSTA does not impose liability on intermediaries based on generalized or constructive knowledge.

Though the Supreme Court has not squarely determined what level of scienter a plaintiff must show to hold a distributor liable for carrying obscenity or child pornography, it has made clear that the answer implicates the First Amendment. This is because the imposition of liability with too low a scienter requirement has a chilling effect. It "tends to impose a severe limitation on the public's access to constitutionally protected matter" by "stifl[ing] the flow of democratic expression and controversy at one of its chief sources." *Smith v. California*, 361 U.S. 147, 152–53 (1959); *see also Ginsberg v. New York*, 390 U.S.

9

629, 644 (1968) (declining to further define the level of scienter required by the First Amendment where a New York statute prohibiting the knowing sale of obscenity to minors had been construed by the state's highest court to reach "not innocent but calculated purveyance of filth").

As the Supreme Court has explained in the context of traditional distributors of third-party speech, "if [a] bookseller is criminally liable without knowledge of the contents . . . he will tend to restrict the books he sells to those he has inspected." *Smith*, 361 U.S. at 153. And "[i]f the contents of bookshops and periodical stands were restricted to material of which their proprietors had made an inspection, they might be depleted indeed." *Id.*[4] Thus, even when courts considered the universe of content available via, for example, magazines alone, they recognized that requiring the "distributor . . . to monitor each issue of every

---

[4] Plaintiffs allege that Omegle can be held liable based on "generalized knowledge." *Omegle*, 2022 WL 93575, at *6. The term "generalized knowledge" here refers to having "knowledge of prior instances of sex trafficking" and information indicating "that the platform had been used as a sex trafficking tool in the past." *Id.* Some older Fifth Circuit opinions regarding obscenity law use the term differently, describing circumstances where distributors had actual knowledge that specific materials were sexual in nature, but not knowledge that the law would find them obscene. *United States v. Linetsky*, 533 F.2d 192, 204 (5th Cir. 1976); *see also, e.g.*, *United States v. Hill*, 500 F.2d 733, 740 (5th Cir. 1974); *United States v. New Orleans Book Mart, Inc.*, 490 F.2d 73, 75 (5th Cir. 1974) (per curiam). Those cases are not relevant, therefore, to the question before this Court.

periodical it distributes . . . would be an impermissible burden on the First Amendment." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139 (2d Cir. 1984).

This applies with even more force to online intermediaries like Omegle, as well as Twitter, WhatsApp, Amazon Web Services, and other providers who will be governed by the outcome of this case. Online, millions of users "communicate with one another and [] access vast amounts of information from around the world." *Reno*, 521 U.S. at 850. As a result, "[i]t would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message . . . interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331; *see also Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1248 (S.D. Fla. 2020). That is why "[t]he specter of [] liability in an area of such prolific speech [has] an obvious chilling effect," *Zeran*, 129 F.3d at 331; *Kik Interactive*, 482 F. Supp. 3d at 1248 —as shown by the real-world impacts described *infra* Section II.C.

At the same time, online intermediaries typically have little control over the content users post on their services[5]—and that, too, contributes to the chilling

---

[5] Omegle is "designed to enable users to communicate with other users" and "does not exert any control over the individuals [users] interact with." Omegle, *Terms of Service Agreement*, https://bit.ly/39IytRx. Omegle has no legal obligation to monitor the communication channels it provides. *See Almeida v. Amazon.com*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006) (finding, in a right of publicity case, that

effect that imposing liability without actual knowledge would have. This is one reason that the First Amendment distinguishes between creators of illegal materials and those who make them available. *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77 n.5 (1994) (explaining that a video store must have a higher scienter than a producer in order to be liable for distributing child pornography because of "the reality that producers are more conveniently able to ascertain" information about the content).[6]

The fact that the liability at issue here is civil does not change the analysis. "What a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law," for "[t]he fear of damage awards . . . may be markedly more inhibiting than the fear of prosecution under a criminal statute." *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 277 (1964).

---

there was "no issue of actual or constructive knowledge because the Florida right of publicity does not impose upon interactive service providers an obligation to filter or censor content"); *see also* 18 U.S.C. § 2258A(f) (obligation to report sex crimes involving minors does not impose an obligation to monitor users or service).

[6] It is also worth noting that individuals and organizations engaging in constitutionally protected online speech are challenging FOSTA's constitutionality in the courts. For example, the plaintiffs in *Woodhull Freedom Foundation v. United States*, No. 18-1552, 2022 WL 910600 (D.D.C. Mar. 29, 2022), *appeal docketed*, No. 22-5105 (D.C. Cir. Apr. 25, 2022), assert that Section 1591(e) violates the First Amendment and the Due Process clause by making "assisting, supporting, or facilitating" sex trafficking a violation of federal law without specifying what those acts entail.

Indeed, in *Manual Enterprises, Inc. v. Day*, the Supreme Court reversed a lower court's determination that the government could civilly bar distribution of magazines without, at a minimum, first establishing that the magazine publisher "knew that at least some of his advertisers were offering to sell obscene material." 370 U.S. 478, 492 (1962). In the opinion offering the narrowest grounds for the judgment and therefore the holding of the case, *see Marks v. United States*, 430 U.S. 188, 193 (1977), Justice Harlan, joined by Justice Stewart, explained that "a substantial constitutional question would arise were we to construe [the law] as not requiring proof of scienter in civil proceedings." *Manual Enterprises*, 370 U.S. at 492.[7]

While noting that the statute at issue in *Smith* was criminal, the justices concluded that its logic must also apply to a civil penalty, because the "heavy financial sacrifice" a civil judgment could entail would as effectively "'impose a severe limitation on the public's access to constitutionally protected matter,' as would a state obscenity statute[.]" *Id.* at 492–93 (quoting *Smith*, 361 U.S. at 153). Faced with potential civil liability, "a magazine publisher might refrain from

---

[7] In a separate opinion, Justice Brennan, joined by Chief Justice Warren and Justice Douglas, concluded that the civil law did not authorize the Postmaster General to employ his own administrative process to close the mail to obscene publications. *Manual Enters., Inc.*, 370 U.S. at 519. Those justices, too, recognized the "constitutional difficulty tha[t] inheres in" determining the scienter required by the First Amendment for a civil order. *Id.* at 498.

accepting . . . materials, which might otherwise be entitled to constitutional protection," thus "depriv[ing] such materials . . . of a legitimate and recognized avenue of access to the public." *Id.* at 493. The same is true here: opening the door to civil suits on the basis of constructive knowledge would raise a serious First Amendment question, and it would severely chill online speech—two results that this Court can avoid by holding that the statute requires actual knowledge.

## II.    Given the realities of how intermediaries moderate content, an actual knowledge standard is critical to ensuring that online expression remains free and robust.

The First Amendment implications of expanding liability under FOSTA are not hypothetical. Although courts have had limited opportunities to interpret the meaning of the amendment to Section 230 regarding civil liability, the other sections of FOSTA, which expanded criminal liability based on at least a knowing mens rea, have already had a significant and harmful effect on online speech, association, and safety—especially that of sex workers and the very children FOSTA sought to protect. Opening the door to civil liability on the basis of merely constructive knowledge would only exacerbate those harms.

### A.    Congress enacted Section 230 to foster freedom of expression online, informed by how intermediaries moderate content.

Section 230 was informed by Congress's understanding of how exposing intermediaries to liability for content posted by their users would influence their content moderation decisions and restrict user speech. Congress correctly

recognized that "[f]aced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted." *Zeran*, 129 F.3d at 331; *see also Jones v. Dirty World Entm't. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (describing how Section 230 protects unpopular online speech against a "heckler's veto").

To avoid these chilling effects, Section 230 forbids "the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions," including the moderation of content. *Zeran*, 129 F.3d at 331. Indeed, an "important purpose of [Section] 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services." *Id.* For that reason, Section 230 barred both strict liability and notice-based liability, as either "would deter service providers from regulating the dissemination of offensive material over their own services." *Id.* at 333.

Nevertheless, Section 230 included several narrow exceptions to the immunity it provided, such as for violations of federal criminal law. In 2018, Congress added a further exception as part of FOSTA to address Congress' concern that some websites had avoided liability for knowingly engaging in sex trafficking. *See* S. Rep. No. 115-199, at 4 (2018) (explaining, in the committee report accompanying the Senate bill, that the purpose of FOSTA is to ensure that

an interactive computer service "cannot avoid liability" if it is "knowingly assisting, supporting, or facilitating sex trafficking"). By targeting FOSTA's Section 230(e)(5)(A) revision at intermediaries that knowingly engage in sex trafficking, Congress purportedly attempted to create a limited exception to the immunity conferred by Section 230—one which would not undermine Section 230's overall purpose of protecting online freedom of expression.

B.    FOSTA has already harmed online speech and online communities.

In addition to the civil implications at issue here, FOSTA expanded the existing criminal provisions codified in 18 U.S.C. § 1591(a), which falls within Section 230's pre-FOSTA exception for federal criminal prosecutions. Congress expanded that section, which had previously applied only to constitutionally-unprotected speech, *see Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 106 (D.D.C. 2016), to reach any "knowing[] assist[ance of], support [for], or facilitat[ion of]" a violation of Section 1591(a)(1). 18 U.S.C. § 1591(e)(4). FOSTA also amended Section 230 to allow state authorities to prosecute interactive communications services under state law if the underlying conduct would violate 18 U.S.C. § 1591. And it created a new federal crime, codified at 18 U.S.C. § 2421A, prohibiting the use or attempted use of any facility of interstate commerce to promote or facilitate the prostitution of another person.

16

A June 2021 report by the Government Accountability Office (GAO) showed that federal prosecutors had not used the additional criminal penalties established by FOSTA.[8] At that time—more than three years after the passage of the law—the DOJ had prosecuted only one case using FOSTA.[9] At the same time, the GAO reported that "gathering tips and evidence to investigate and prosecute those who control or use online platforms has become more difficult," including investigating crimes against children.[10]

On the other hand, FOSTA has incentivized intermediaries to remove lawful content about sex work, sex, and sexuality—and it has made sex work more dangerous and, as noted above, sex trafficking harder to track in the process.[11] Social media platforms like Instagram and Tumblr have broadly censored lawful topics related to sex to avoid liability.[12] Other platforms—especially niche, free,

---

[8] U.S. Gov't Accountability Off., GAO-21-385, *SEX TRAFFICKING: Online Platforms and Federal Prosecutions* 25 (2021), https://bit.ly/3mUc1YV.

[9] *Id.*

[10] U.S. Gov't Accountability Off., *Highlights of GAO-21-385* (2021), https://bit.ly/3mUc1YV.

[11] *See* Kendra Albert et al., *FOSTA in Legal Context*, 52.3 Columbia Human Rights L. Rev. 1084, 1088–89 (2021). Recognizing the severity of these problems, members of Congress have introduced the SAFE SEX Workers Study Act to conduct a federal study on the actual impact of FOSTA on sex workers. *See* S. 3758, 117th Cong. (2022); H.R. 6928, 117th Cong. (2022).

[12] *See* Helen Holmes, *"First They Come for Sex Workers, Then They Come for Everyone," Including Artists*, Observer (Jan. 27, 2021), https://bit.ly/3xDqCOd

and queer websites—have gone offline entirely.[13]

This has pushed people in the sex trades, who work in legal, semi-legal, and criminalized industries, off online platforms and into dangerous and potentially life-threatening scenarios. In 2020, Hacking//Hustling conducted a study of FOSTA's effects on sex workers. Researchers found that the law had increased "economic instability for 72.45% of the online participants . . . with 33.8% reporting an increase of violence from clients."[14] Perhaps this is not surprising given that many affordable ways to advertise have shut down following FOSTA.[15] This has made sex workers more vulnerable to labor exploitation, and also made labor trafficking in the sex industry less visible.[16]

---

(reporting that, in the wake of FOSTA, Instagram has removed accounts belonging to as well as posts by poets, writers, and artists discussing sex work); *see also* Shannon Liao, *Tumblr Will Ban All Adult Content on December 17th*, Verge (Dec. 3, 2018), https://bit.ly/2SmoC5A.

[13] Kendra Albert, *Five Reflections from Four Years of FOSTA/SESTA* at 14, Cardozo Arts & Entm't L. J. (forthcoming), https://bit.ly/3MNuSiQ.

[14] Danielle Blunt & Ariel Wolf, Hacking//Hustling, *Erased: The Impact of FOSTA-SESTA & the Removal of Backpage* 18 (2020), https://bit.ly/3HeFaac.

[15] Survivors Against SESTA, *Documenting Tech Actions*, https://bit.ly/3NH57Sq.

[16] Blunt & Wolf, *supra* note 14, at 18.

FOSTA has also caused platforms to shut down harm reduction tools like "bad johns" lists[17] and "VerifyHim," a system that helped sex workers vet clients by providing them with references. Individuals and harm reduction organizations also reported that FOSTA made them wary of sharing harm-reduction and safety tips or doing check-ins with fellow workers.[18] Some sex workers have had to return to in-person client-seeking in bars and clubs, where screening is necessarily more rushed, and where workers are more vulnerable.[19] TheBody, an organization that publishes HIV-related information, news, support, and personal perspectives, reports that FOSTA has put sex workers at greater risk of HIV infection.[20]

C.   Expanding civil liability under FOSTA to reach less-than-knowing conduct would only exacerbate these problems.

Plaintiffs' interpretation of FOSTA would only further encourage online intermediaries to engage in undesirable content moderation practices, and could thereby exacerbate harms imposed on sex workers, as well as healthcare workers

---

[17] Nitasha Tiku, *Craigslist Shuts Personal Ads for Fear of New Internet Law*, WIRED (Mar. 23, 2018), https://bit.ly/3zzl88G.

[18] Blunt & Wolf, *supra* note 14, at 33.

[19] Jake Ketchum & Laura LeMoon, *What Sex Workers Have to Say About HIV After FOSTA/SESTA*, TheBody (July 3, 2018), https://bit.ly/3ttYI4N (sex workers describing being forced from the relative safety of Internet work to the streets, vastly increasing their vulnerability to arrest, police harassment, and violence).

[20] *Id.*

and teens. As reflected by the experiences detailed above, some intermediaries will respond by removing even more lawful content. Others may design their services to avoid learning facts that could be said to give them constructive knowledge about the content posted on their services, and may carry content they would prefer not to in order to avoid any liability risk, potentially resulting in a bad experience for their users and customers.

1.  *Plaintiffs' interpretation of FOSTA creates a strong incentive for online intermediaries to over-remove user-generated content.*

Plaintiffs allege that Omegle "had knowledge of prior instances of sex trafficking and knew that the platform had been used as a sex trafficking tool in the past" and that "this generalized knowledge is sufficient to place their 18 U.S.C. §§ 1591 and 1595 claims outside the bounds of CDA immunity." *Omegle*, 2022 WL 93575, at *6. If the mere presence of content depicting sex trafficking on their services could expose intermediaries to potential liability, they would likely respond by using aggressive or inexact means to proactively detect and remove even possibly problematic content. And this would adversely impact the First Amendment interests of both users sharing content and those who receive it. *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301, 307 (1965).

The sheer volume and diversity of material transmitted by those who use Omegle's services every day, not to mention the billions of Internet users who use

other services, makes it all but impossible for intermediaries to filter out all illegal or legally risky speech without simultaneously sweeping in, and restricting, a broad swath of lawful material.[21] As the Eighth Circuit recognized, a statute restricting sales of violent videos that "penaliz[ed] video dealers regardless of their knowledge of a video's contents" would lead dealers to "limit videos available to the public to videos the dealers have viewed . . . [which] would impede rental and sale of all videos, including those that the statute does not purport to regulate and that the First Amendment fully protects." *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 690–91 (8th Cir. 1992).

In order to moderate content at scale, service providers often rely at least in part on automated content moderation tools.[22] But those tools increase the risk of over-removals of lawful content, in part because they tend to perpetuate real-world

---

[21] *See, e.g.*, Zoe Kleinman, *Fury over Facebook 'Napalm Girl' Censorship*, BBC News (Sept. 9, 2016), https://bbc.in/2NkjVvf.

[22] In general, automated tools for content moderation—which often take the form of content filters—fall into two categories: (1) matching tools, which "recogniz[e] something as identical or sufficiently similar to something [the tool] has seen before" and (2) prediction, which "recogniz[es] the nature of something based on the [tool's] prior learning," to "predict the likelihood that a previously-unseen piece of content violates a policy.*"* Carey Shenkman, Dhanaraj Thakur & Emma Llansó, Cent. Dem. & Tech., *Do You See What I See*? 12 (May 2021), https://bit.ly/3H9YmGm; Nafia Chowdhury, Stanford Freeman Spogli Inst. Int'l Studies, *Automated Content Moderation: A Primer* 2 (Mar. 19, 2022), https://bit.ly/3zD96Lo.

biases and are unable to understand context.[23] These limitations are inherent to the technology and will be extremely difficult if not impossible to overcome, even in the future.[24]

Imposing liability based on constructive knowledge is also more likely to negatively impact smaller intermediaries, like Omegle, and their users more than it would large intermediaries such as Facebook, Twitter, and Google. Smaller intermediaries, which have fewer resources, may rely more heavily on off-the-shelf automated content moderation tools that indiscriminately remove constitutionally protected, beneficial speech.[25] Further, smaller services designed around a particular issue or community are more severely impacted when a topic or category of online speech and information becomes legally risky to host. Instagram, for example, could broadly remove all posts related to sex and sexuality and continue to host other content of interest to their users. A service dedicated to youth sexual health, however, cannot remove content so indiscriminately and still serve its users' needs.

---

[23] *See* Chowdhury, *supra* note 22, at 3; *see also* Shenkman et al., *supra* note 22, at 7, 29; Natasha Duarte & Emma Llansó, Cent. Dem. & Tech., *Mixed Messages? The Limits of Automated Social Media Content Analysis* 14–19 (Nov. 28, 2017), https://bit.ly/3MNvqoU.

[24] *See* Duarte & Llansó, *supra* note 23, at 21.

[25] *See id.* at 13.

In short, if this Court adopts Plaintiffs' reading of FOSTA, online intermediaries will rely heavily on imprecise automated content moderation tools, which will indiscriminately detect, wrongly label, and remove a range of content that has nothing to do with sex trafficking.[26] Even intermediaries that do not increase their reliance on automated moderation will likely direct their human moderators to remove content more aggressively.

And, much like the criminal provisions of FOSTA—which already have had an asymmetric impact on individuals depending on their sexual orientation,[27] race,[28] and body-type[29]—these effects will not be felt equally. LGBTQ users are particularly likely to be censorship targets. For example, in 2019, Instagram banned six advertisements for the newsletter *Salty* which featured transgender and non-binary people of color, on the erroneous basis that the ads promoted escort

---

[26] *See, e.g.*, Melanie Ehrenkranz, *British Cops Want to Use AI to Spot Porn—But It Keeps Mistaking Desert Pics for Nudes*, Gizmodo (Dec. 18, 2017), https://bit.ly/3aVgHLd (explaining that an automated system used to scan images for nudity often detects desert landscapes as human skin tones and erroneously flags them as "an indecent image or pornography").

[27] *See* Gita Jackson, *Tumblr is Trying to Win Back the Queer Audience It Drove Off*, Vice (May 11, 2021), https://bit.ly/3tsFOeN.

[28] Nosheen Iqbal, *Instagram 'Censorship' of Black Model's Photo Reignites Claims of Race Bias*, Guardian (Aug. 9, 2020), https://bit.ly/3QeW7p7.

[29] Lacey-Jade Christie, *Instagram Censored One of These Photos But Not the Other. We Must Ask Why*, Guardian (Oct. 19, 2020), https://bit.ly/3NH6ssq.

services.[30] Another study showed that Perspective, an artificial intelligence tool created by Google to assign a "toxicity" score to online content, tended to rate tweets by drag queens as "on average more toxic than" those by white supremacists.[31] If intermediaries increase their reliance on automated filters intended to detect sexually explicit materials in order to minimize liability risk, these types of erroneous removals of content by and about LGBTQ people will increase.

Over-censorship is also particularly likely for discussions of sex, sexual health, and sex work. This includes content intended to educate sex workers on their health and safety. For example, strippers who post videos to TikTok have reported having "informational TikToks about sexual health, safety tips and general tutorials" targeted by removals or shadow bans.[32]

Sexual health information more generally is also at greater risk of removal, especially if it is aimed at minors. According to a 2020 report by UNESCO on digital sex education and young people, "sexuality education and information are

---

[30] EJ Dickson, *Why Did Instagram Confuse These Ads Featuring LGBTQ People for Escort Ads?*, Rolling Stone (July 11, 2019), https://bit.ly/3QiTgvI.

[31] Mark Hay, *How AI Lets Bigots and Trolls Flourish While Censoring LGBTQ+ Voices*, Mic (Mar. 21, 2021), https://bit.ly/3tuv3se.

[32] Madeleine Connors, *StripTok: Where the Workers Are V.I.P.s*, N.Y. Times (July 29, 2021), https://nyti.ms/3HfXhgi.

increasingly being delivered through digital spaces, reaching millions."[33] Yet online sexual educators already face over-removal of their content.[34] For example, sex educators on Instagram report facing bans and account removals and that "posts that use flagged words, like 'sex' and 'clitoris,' have been removed from Instagram's search function."[35] An intermediary concerned about liability under an interpretation of FOSTA that imposes liability without actual knowledge may, for example, err on the side of removing content from Planned Parenthood's Teen Council[36] or True Love Waits.[37]

As these examples show, the impact of interpreting FOSTA to impose liability based on generalized knowledge will by no means be limited to intermediaries focused on sex work and sexual health. But these categories of content will face especially challenging hurdles even on general-interest platforms,

---

[33] Susie Jolly et al., UNESCO, *A Review of the Evidence: Sexuality Education for Young People in Digital Spaces* 7 (2020), https://bit.ly/3OcGZXP.

[34] *See* Amber Madison, *When Social-Media Companies Censor Sex Education*, The Atlantic (Mar. 4, 2015), https://bit.ly/3H9gvnH (reporting that Twitter, Facebook, and Google had rejected advertisements from various sexual health organizations as violating their policies prohibiting promotion of sexual or vulgar products or services).

[35] Abigail Moss, *'Such a Backwards Step': Instagram Is Now Censoring Sex Education Accounts*, Vice (Jan. 8, 2021), https://bit.ly/3aQ2L5e.

[36] *E.g.,* Planned Parenthood, *Teen Council*, https://bit.ly/3MDG5lN.

[37] *E.g.*, Lifeway, *Help Students Understand Sexual Purity*, https://bit.ly/3H9Nd8s.

25

as shown by this case and several other lawsuits in which plaintiffs are already seeking to impose liability on platforms merely for their day-to-day operations. *See, e.g., J.B. v. G6 Hospitality, LLC*, No. 4:19-cv-7848, 2020 WL 4901196, at *2, *8 (N.D. Cal. Aug 20, 2020) (alleging that craigslist should be liable under Section 1591, not because it had actual knowledge of sex trafficking on its site, but because it was aware "that its erotic services section was well known to commercial sex customers throughout the United States as a place to easily locate victims" and had been put "on notice of [general] human sex trafficking [content on its site]"); *M.L. v. craigslist, Inc.*, No. 3:19-cv-6153, 2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) (same); Compl. at ¶¶ 8, 56, *Doe v. The Rocket Sci. Grp. LLC*, No. 1:19-cv-5393 (N.D. Ga. Nov. 26, 2019) (alleging that MailChimp—a marketing platform— "made available its marketing resources and expertise" to a website that facilitated sex trafficking and so was "responsible for its natural consequences—the sex trafficking of Jane Doe"); *cf. Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012) (if the Internet Archive crawls an unlawful ad on another platform "and publishes it through its Wayback Machine, knowing that [the platform] has an 'adult services' ad section . . ., is [it] liable?").

       2.      *Plaintiffs' interpretation of FOSTA could create a perverse incentive for some online intermediaries to deliberately ignore the content posted on their services.*

Some intermediaries may react in a different, but just as detrimental, way if this Court reverses the ruling below. An intermediary may well respond by making it difficult for users and others to inform it about alleged sex trafficking material or other objectionable content on its service. The intermediary may, for example, provide no public company contact information or other channels for users to report such content. Moreover, an intermediary may go so far as to not moderate content at all, so it can disclaim any alleged constructive knowledge of such content.

These results ultimately harm users and the public. Making it harder for users to report content depicting sex trafficking will mean that more of it remains on an online service. Discouraging intermediaries from engaging in content moderation will also mean that a variety of content that intermediaries might otherwise choose to regulate—including what they deem disinformation, hate speech, harassment, and promotion of suicide and self-harm—will instead spread unchecked. This outcome is not what Congress intended when it enacted Section 230, or when it passed FOSTA amending it.

27

## CONCLUSION

For these reasons, amici respectfully urge this Court to uphold the district court's decision granting Defendant–Appellee's motion to dismiss and to hold that loss of immunity under Section 230(e)(5)(A) cannot be based on constructive knowledge.

Dated: June 24, 2022                    Respectfully submitted,

                                        */s/ Vera Eidelman*
                                        Vera Eidelman
                                        AMERICAN CIVIL LIBERTIES UNION
                                          FOUNDATION
                                        125 Broad Street, 18th Floor
                                        New York, NY 10004
                                        (212) 549-2500
                                        veidelman@aclu.org

                                        *Counsel of Record for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 6,170 words, excluding the items exempted by Fed. R. App. P. 32(f), and complies with the length specifications set forth by Fed. R. App. P. 29(a)(5). I further certify that this brief was prepared using 14-point Times New Roman font, in compliance with Fed. R. App. P. 32(a)(5) and (6).

Dated: June 24, 2022

/s/ Vera Eidelman
Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
veidelman@aclu.org

Counsel of Record for Amici Curiae

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that on June 24, 2022, I electronically filed the foregoing

Amici Curiae Brief with the Clerk of the Court for the United States Court of

Appeals for the Eleventh Circuit using the CM/ECF system, which effects service

upon all counsel of record.


Dated: June 24, 2022          */s/ Vera Eidelman*
                                             Vera Eidelman
                                             AMERICAN CIVIL LIBERTIES UNION
                                               FOUNDATION
                                             125 Broad Street, 18th Floor
                                             New York, NY 10004
                                             (212) 549-2500
                                             veidelman@aclu.org

                                             *Counsel of Record for Amici Curiae*