ORAL ARGUMENT NOT YET SCHEDULED

NO. 22-10338

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

M.H., ET AL.,

PLAINTIFFS-APPELLANTS,

V.

OMEGLE.COM LLC,

DEFENDANT-APPELLEE,

On Appeal from the United States District Court
for the Middle District of Florida (Case No. 8:21-cv-00814-VMC-TGW)

**_BRIEF OF AMICI CURIAE_ FLOOR64, INC. D/B/A THE COPIA
INSTITUTE IN SUPPORT OF DEFENDANT-APPELLEE**

Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone:  202-642-2849
Email: cathy@cgcounsel.com

,

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Amicus Curiae certifies that, in addition to those persons listed in the first filed brief's certificate of interested persons, and updated by amici curiae and defendant-appellee's brief, the following is a complete supplemental list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Floor64, Inc., d/b/a The Copia Institute, *Amicus Curiae*

2. Gellis, Catherine, *Attorney for Amicus Curiae*

3. Masnick, Michael, *Founder and principal of Amicus Curiae*

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Floor64, Inc. d/b/a The Copia Institute states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT .................................................................. ii

STATEMENT OF IDENTIFICATION .................................................... 1

STATEMENT OF ISSUE ........................................................................ 2

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ........................................................................................... 3

I.    Finding Section 230 does not bar the plaintiffs-appellants' claims would
      contravene and undermine the very deliberate policy Congress chose in
      order to foster expression on the Internet ........................................ 3

II.   Upending the policy balance Congress struck with Section 230 would hurt
      vulnerable people ............................................................................... 6

      A.    It would limit vulnerable people's practical ability to speak online,
            including against those who would hurt them ...................... 6

      B.    It would make the online platforms that do remain available more
            toxic and dangerous .............................................................. 12

III.  Finding that Section 230 does not bar these claims would result in harm that
      would be widely felt by online platforms and speakers, including by amicus
      Copia Institute ................................................................................. 14

CONCLUSION ....................................................................................... 19

CERTIFICATE OF COMPLIANCE ...................................................... 20

CERTIFICATE OF SERVICE .............................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ................................................. 11, 19

*Carafano v. Metrosplash.com, Inc.*, 339, F.3d 1119 (9th Cir. 2003) ......................10

*Doe v. Bolland*, 698 F.3d 877 (6th Cir. 2012) ..........................................................13

*Fair Housing Coun. Of San Fernando Valley v. Roommates.com*, 521 F.3d 1157

      (9th Cir. 2008) .............................................................................................14

*Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal.

      2020) .........................................................................................................11

*Netchoice v. Moody*, No. 21-12355, slip op.  (11th Cir. May 23, 2022) ................18

*Reno v. ACLU*, 521 U.S. 844 (1997) .......................................................................10

*Stratton Oakmont v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24,

      1995) ................................................................................................. 11, 14

*UMG Recordings, Inc. v. Shelter Capital Partners*, 718 F. 3d 1006 (9th Cir. 2013)

      ...................................................................................................................14

*Woodhull Freedom Foundation v. U.S.*, 948 F.3d 363 (D.C. Cir. 2020) ...............16

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)........................................16

**Statutes**

47 U.S.C. § 230(a)(5)...............................................................................................10

47 U.S.C. § 230(b)(1)...............................................................................................16

47 U.S.C. § 230(b)(2)...............................................................................................10

47 U.S.C. § 230(c) ...........................................................................................11

47 U.S.C. § 230(c)(1) ......................................................................................11

47 U.S.C. § 230(c)(2) ......................................................................................11

47 U.S.C. § 230(e)(2) ......................................................................................14

47 U.S.C. § 230(f)(2) .........................................................................................9

**Other Authorities**

Danielle Blunt and Ariel Wolf, *Erased: The Impact of SESTA-FOSTA*,

    HACKING//HUSTLING, available at https://hackinghustling.org/wp-

    content/uploads/2020/01/HackingHustling-Erased.pdf ................................17

Engine, *Section 230 Cost Report*, available at http://www.engine.is/s/Section-230-

    cost-study.pdf.................................................................................................13

Eric Goldman, *Section 230 Protects Hyperlinks in #MeToo "Whisper Network"–*

    *Comyack v. Giannella*, TECHNOLOGY LAW & MARKETING BLOG (Apr. 28,

    2020) ..............................................................................................................18

Michael Masnick, *Don't Shoot The Message Board*, June 2019, available at

    https://copia.is/library/dont-shoot-the-message-board/................................21

Michael Masnick, *Hey North Face! Our Story About You Flipping Out Over 'Hey*

    *Fuck Face' Is Not Trademark Infringement*, TECHDIRT (Nov. 15, 2021) .....23

Michael Masnick, *Our Legal Dispute With Shiva Ayyadurai Is Now Over*,

    TECHDIRT (May 17, 2019) ............................................................................24

Michael Masnick, *The Chilling Effects Of A SLAPP Suit: My Story*, TECHDIRT

(Jun. 15, 2017) ...............................................................................24

Michael Masnick, *Why Moderating Content Actually Does More To Support The*

*Principles Of Free Speech*, TECHDIRT (Mar. 30, 2022) ................................18

Peter Kafka, *Veoh finally calls it quits: layoffs yesterday, bankruptcy filing soon*,

C|NET (Feb. 11, 2010) ................................................................................15

Ron Wyden, *I wrote this law to protect free speech. Now Trump wants to revoke it*,

CNN BUSINESS (June 9, 2020)............................................................... 17, 19

## STATEMENT OF IDENTIFICATION[1]

Amicus Copia Institute is the think tank arm of Floor64, Inc., the privately-held small business behind Techdirt.com ("Techdirt"), an online publication that has chronicled technology law and policy for nearly 25 years.  In this time Techdirt has published more than 70,000 articles regarding subjects such as freedom of expression, platform liability, copyright, trademark, patents, privacy, innovation policy and more.  The site often receives more than a million page views per month, and its articles have attracted nearly two million reader comments, which itself is user expression that advances discovery and discussion around these topics.  As a think tank the Copia Institute also produces white papers examining the evidence underpinning tech policy, and, armed with this insight, it regularly files regulatory comments, amicus briefs, and other advocacy instruments on these subjects to help educate lawmakers, courts, and other regulators – as well as innovators, entrepreneurs, and the public – with the goal of influencing good policy that promotes and sustains innovation and expression.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), amicus curiae certifies that all parties in this case have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(c)(5), amicus curiae further certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

The Copia Institute also itself depends on the First Amendment and the platform liability protection afforded by 47 U.S.C. § 230 ("Section 230") – subjects directly implicated by this case – to both enable the robust public discourse found on its Techdirt website and for its own expression to reach its audiences throughout the Internet and beyond. The Copia Institute therefore submits this brief amicus curiae wearing two hats: as a longtime commenter on the issues raised by this litigation, and as a small business whose constitutional and statutory rights protecting its expression would be threatened if the decision by the district court were overturned.

## STATEMENT OF ISSUE

Whether the District Court erred by finding that Section 230 bars Plaintiffs-Appellants' claims against appellee.

## SUMMARY OF ARGUMENT

When terrible things happen like the abuse at the heart of this case, justice would seem to call for a remedy. And if it appears that some twenty-five-year-old federal statute is standing between a worthy plaintiff and a remedy, it can be tempting for courts to ignore it in order to find a way to grant that relief.

But it is important to resist that temptation, as the district court here did, because in cases like these, where a remedy is being sought not from the person who caused the actual harm but instead from a third-party Internet platform, there is much

more at stake than just the victim's interests.  Or even just this particular Internet platform's interests.

Rather, this case affects *all* platforms' interests, and consequently all Internet users' interests, including those of other vulnerable people who depend on Internet platforms to be available to help them speak online, including against those who would hurt them.  It would have this effect because cases like these are really speech cases, and laws like Section 230 that protect speech are on the books for good reason. They are diminished at our peril, because doing so imperils all the important expression they are designed to protect.

To avoid this harm to free expression, the district court's decision holding that Section 230 prevents plaintiffs-appellants' claims against Omegle should be upheld.

## ARGUMENT

I.      **Finding Section 230 does not bar the plaintiffs-appellants' claims would contravene and undermine the very deliberate policy Congress chose in order to foster expression on the Internet**

The Internet is unique: for expression to get from one person to another it needs systems and services to help it.  We call these helpers many things – service providers,[2] intermediaries, or, as often used in this litigation, platforms – and they

---

[2] Section 230 defines them as "interactive computer service providers." 47 U.S.C. § 230(f)(2) ("The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or

come in many shapes and sizes, providing all sorts of intermediating services, from network connectivity to messaging to content hosting, and more. But all of them need to feel legally safe to provide that help, or else they won't be able to.

When Congress contemplated the Internet in the mid-1990s it recognized that for it to fulfill its promise of providing "a variety of political, educational, cultural, and entertainment services," 47 U.S.C. § 230(a)(5), enabling "a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," 47 U.S.C. § 230(a)(3), it was going to need to make it safe for platforms to take the chance of being in the business of helping that online world flourish. See 47 U.S.C. § 230(b)(2). At the same time, Congress also was concerned about the hygiene of the online world. *See Reno v. ACLU*, 521 U.S. 844, 849 (1997) (litigating the rest of the Communications Decency Act Section 230 was passed into law with). *See also Carafano v. Metrosplash.com, Inc.*, 339, F.3d 1119, 1122 (9th Cir. 2003) ("The Statute is designed at once to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material.").

In other words, Congress had two parallel and complementary goals: foster the most positive expression online, *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th

_____

system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.").

Cir. 2003), and minimize the most negative. *Id.* at 1028. And the best way to achieve both of these goals was not to try to bludgeon platforms into doing its bidding out of fear of sanction, because that was never going to produce good results.[3] *See id.* at 1029-30. Rather, Congress passed Section 230 to make it legally safe for platforms to do the best they could on both fronts.

It did so through two complementary provisions, which, as subparts of the same heading, are designed to work in tandem. *See* 47 U.S.C. § 230(c) ("Protection for 'Good Samaritan' blocking and screening of offensive material."). The first, at subsection (c)(1), precludes holding a platform liable for content created by another. 47 U.S.C. § 230(c)(1). The second, at subsection (c)(2), prevents holding a platform liable for its attempts to remove others' speech from their systems. 47 U.S.C. § 230(c)(2). While the first provision encourages platforms to play a critical role in promoting the most online speech, the second encourages platforms to help rid the Internet of the most undesirable.[4] Thanks to the immunity each provision affords them they can afford to be available to facilitate the most content possible because they don't have to worry about crippling liability if something ends up on their

---

[3] The *Stratton Oakmont v. Prodigy* case taught Congress that the fear of legal sanction was instead likely to deter platforms from doing what it wanted them to do, such as moderating user expression. *Stratton Oakmont v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). See discussion *infra* Section II.

[4] In practice the language at (c)(1) has also served to provide platforms protection for moderation decisions as well. *See*, *e.g.*, *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119-20 (N.D. Cal. 2020).

systems that is legally problematic.  And they can afford to take steps to remove the most undesirable content, because thanks to this immunity they don't have to worry about crippling liability arising if they do.

And Congress's plan has worked: as a result of Section 230 being an incentive-based "carrot" sort of law, where Congress has aligned platforms' interests with its own, rather than a punitive "stick" sort of law, where their interests would inherently be in tension, platforms, and all the user expression they facilitate, including necessary and beneficial expression, have been able to proliferate as Congress had hoped because platforms have not had to fear being crushed by liability if they did not either facilitate or moderate user expression as everyone might somehow agree they should have.

But if this court were to find that Section 230 did not apply to the instant case it would undermine that promise by dramatically increasing the legal risk inherent in being any kind of Internet platform at all, with significant consequence to online speech and innovation far beyond this case.

## II.    Upending the policy balance Congress struck with Section 230 would hurt vulnerable people

### A. It would limit vulnerable people's practical ability to speak online, including against those who would hurt them

In its brief the plaintiffs-appellants ask for the seriousness of the harm at issue to trump the free speech concerns implicated by this case, which would be directly

affected by limiting the applicability of Section 230.  Appellants' Br. 15.[5]  But it is because of the seriousness of harm that can occur to people that harm to free expression must be avoided.  Vulnerable people are especially in need of being able to speak online, especially in defense against sources of injury.  But their practical ability to do so will be weakened in a world where Section 230 has been weakened and fewer platforms will therefore be willing and available to facilitate their speech.

In passing Section 230 Congress understood that platforms could be easily obliterated if they potentially had to answer for their users' content, which someone could easily claim to be wrongful in some way.  The claims would not even have to be meritorious because the concern was not one of ultimate liability for the platform. Civil litigation is notoriously expensive, and simply having to defend itself could bleed a platform dry.[6]  Having Section 230 deter these lawsuits outright, or at least

---

[5] The case plaintiffs-appellants cite, *Doe v. Bolland*, also does not stand for the proposition that free expression concerns should always be easily swept away in cases involving child pornography.  *Doe v. Bolland*, 698 F.3d 877, 883 (6th Cir. 2012).  *Boland* held that the First Amendment could not redeem as lawful the material at issue in that case.  But such is not the relevance of the First Amendment here.  In this case the issue is that the platforms that depend on Section 230 depend on it to facilitate all sorts of material, including myriad *lawful* material.  Were that protection to be obviated by allowing these claims to proceed it would be injurious to perfectly lawful expression protected by the First Amendment, and *Boland* does not green-light ignoring such expressive harm, especially not when doing so would inherently impact vulnerable people's expression.

[6] The cost of defending even one frivolous claim can easily exceed a startup's valuation.  Engine, *Section 230 Cost Report*, available at http://www.engine.is/s/Section-230-cost-study.pdf.  Simply responding to demand letters can cost companies thousands of dollars in lawyer fees, not to mention any

help companies get out of them relatively inexpensively, helps ensure that a company won't die a "death by ten thousand duck-bites." *Fair Housing Coun. Of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1174 (9th Cir. 2008). Furthermore, even in the mid-1990s it was apparent that the amount of user-generated content platforms could handle would make having to answer for even a small percentage of it impossible. *See id.* at 1163 (citing *Stratton Oakmont v. Prodigy Services Co.*, 1995 WL 323710 at *3 ("Prodigy claimed that the 'sheer volume' of message board postings it received—at the time, over 60,000 a day – made manual review of every message impossible; thus if it were forced to choose between taking responsibility for all messages and deleting no messages at all, it would have to choose the latter course.")).

Of course, having to defend against even one case can be fatal to a platform. For instance, in *UMG Recordings, Inc. v. Shelter Capital Partners*, 718 F. 3d 1006 (9th Cir. 2013), Section 230 was unavailable to protect the platform because the underlying claim against the user material in question was rooted in copyright, and intellectual property claims are excluded from Section 230. 47 U.S.C. § 230(e)(2).

---

obligations to preserve documents the letter might trigger, which themselves impose non-trivial costs, especially for smaller companies without the infrastructure larger companies may have to manage them. *Id.* And if these cases somehow manage to go forward, the costs threaten to be even more ruinous. A motion to dismiss can easily cost in the tens of thousands of dollars. *Id.* But at least if the company can get out of the case at that stage they will be spared the even more exorbitant costs of discovery, or, worse, trial. *Id.*

Instead it was only protected by the much weaker and more conditional Digital Millennium Copyright Act.  17 U.S.C. § 512.  Eventually the courts found in favor of the platform and that it was not liable for the user material, but by that point the platform had already been bankrupted by the costs of the litigation.  *See* Peter Kafka, *Veoh finally calls it quits: layoffs yesterday, bankruptcy filing soon*, C|NET (Feb. 11, 2010), http://www.cnet.com/news/veoh-finally-calls-it-quits-layoffs-yesterday-bankruptcy-filing-soon/ (describing how the startup platform could not get funding and so went out of business while it was litigating the lawsuit it eventually won). The plaintiffs-appellants invite this Court to allow more litigation to ensue before deciding whether or not Section 230 should apply to this platform.  Appellants' Br. 10.  But as the *Shelter Capital* case illustrates, if one has to litigate whether platform protection applies, it doesn't really matter whether it turns out that it does because the damage will have already been done – meaning that, functionally, the protection never will apply.[7]

Without adequate protection for platforms, as Section 230 is intended to provide, at least one of two things would happen: there either would be no platforms,

---

[7] It is also unclear what purpose further litigation here could advance, because the harm at issue in this case remains connected with material generated by a platform user and not the platform, which places this case squarely within the purview of Section 230.  Nor is there any reason to believe that invasive and expensive discovery the plaintiffs-appellants propose doing into the platform's "algorithms," "profit model," "knowledge," "product design," "content moderation," or "monetization" could ever reveal otherwise.  Appellants' Br. 10.

which is clearly not what Congress wanted when it passed Section 230, *see* 47 U.S.C. § 230(b)(1), or those platforms that manage to hold on would have to be extremely selective about what user expression they facilitated and consequently be compelled to refuse lawful expression in order to minimize the risk. *See Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) ("Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted.").

But refusing speech is not a hypothetical concern. When Congress recently amended Section 230 with the provisions from FOSTA it shrank its protection so substantially that platforms began refusing user speech – including facially lawful speech. *See Woodhull Freedom Foundation v. U.S.*, 948 F.3d 363, 368-69 (D.C. Cir. 2020) ("For example, Craigslist eliminated its Personals and Therapeutic Services sections. […] In a public statement, Craigslist explained that it had taken these services online because [of FOSTA] and it did not want to risk liability and jeopardize its other services."). And that refusal to facilitate actual expression led to measurable harm, including in the form of violence and sexual abuse for people who could no longer speak online and thus lost the important protection Internet platforms had previously afforded them, now that they were unavailable for their expression. *See* Danielle Blunt and Ariel Wolf, *Erased: The Impact of SESTA-FOSTA*, HACKING//HUSTLING, available at https://hackinghustling.org/wp-

10

content/uploads/2020/01/HackingHustling-Erased.pdf ("The stated goal of [FOSTA] was to reduce human trafficking by amending [Section 230]. What the law has actually done is put increased pressure on Internet platforms to censor their users for fear of civil and criminal liability. While the law has been lauded by its supporters, the communities that it directly impacts claim that it has increased their exposure to violence and left those who rely on sex work as their primary form of income without many of the [platform services] they use to keep themselves safe.").

The bottom line is that if platforms have to exist in a world where Section 230's protections are functionally unavailable to them, it will result in less availability for user speech, including the speech of vulnerable people seeking to speak out against those who would hurt them. *See*, *e.g.*, Ron Wyden, *I wrote this law to protect free speech. Now Trump wants to revoke it*, CNN BUSINESS (June 9, 2020), https://www.cnn.com/2020/06/09/perspectives/ron-wyden-section-230/index.html ("[W]ithout 230, the people without power – people leading movements like #MeToo and Black Lives Matter – would find it far harder to challenge the big corporations and powerful institutions. Without 230, I believe that not a single #MeToo post would have been allowed on moderated sites.").[8] *See also* Eric Goldman, *Section 230 Protects Hyperlinks in #MeToo "Whisper Network"–*

---

[8] As the article notes, now-Senator Wyden was one of the original authors of Section 230 with Chris Cox back when they were Democratic and Republican Congressmen, respectively.

*Comyack v. Giannella*, TECHNOLOGY LAW & MARKETING BLOG (Apr. 28, 2020), https://blog.ericgoldman.org/archives/2020/04/section-230-protects-hyperlinks-in-metoo-whisper-network-comyack-v-giannella.htm.  As concerning as the harm is in this case, it is to avoid more of it that Section 230 must be found to bar these claims.

### B. It would make the online platforms that do remain available more toxic and dangerous

Section 230 performs another critical function besides making it possible for platforms to be available to facilitate others' speech.  From the outset, a critical function was to ensure that platforms could moderate their platforms to best protect their user communities.  Although the First Amendment provides platforms the right to choose what content to associate with, *Netchoice v. Moody*, No. 21-12355, slip op. at 19 (11th Cir. May 23, 2022), Section 230 gives that right practical effect by insulating platforms from having to answer for liability decisions related to making sure that their community members not only can speak but that they can do so in an environment conducive to it.  *See* Michael Masnick, *Why Moderating Content Actually Does More To Support The Principles Of Free Speech*, TECHDIRT (Mar. 30, 2022), https://www.techdirt.com/2022/03/30/why-moderating-content-actually-does-more-to-support-the-principles-of-free-speech/.

It also ensures that they can do this moderation meaningfully.  Section 230 was passed partially in response to the *Stratton Oakmont* case, where a state court had found the platform's promise to police content could be the basis for liability.

12

*Batzel*, 333 F.3d at 1029.  Because the platform had looked to see what content was there, the court found that it could therefore be held responsible for it.  *Id.*

The *Stratton Oakmont* decision therefore created a perverse incentive for the platform.  If it tried to moderate user content, it could face enormous liability for that content.  But if it didn't try to moderate, it would expose its users to a terrible user experience from offensive content provided by others, which the platform would never be able to safely remove.

Congress did not want platforms to find themselves in that untenable position, and so Section 230 was passed to ensure it would not need to.  Wyden ("[Section 230] also gave companies a sword so that they can take down offensive content, lies and slime – the stuff that may be protected by the First Amendment but that most people do not want to experience online. And so they are free to take down white supremacist content or flag tweets that glorify violence […] without fear of being sued for bias or even of having their site shut down.").  By not having liability for others' content, it would not matter if the platform actually knew or even could know what troubling content was there or not, which would mean the platform could afford to try to police their platform because those efforts could not lead to their ruin.

Shielding platforms from liability also gives them a free hand to do the best they can for their users.  The specter of liability would otherwise contort their decisions and coopt resources to do what it took to protect themselves against

liability, rather than do what would be best for their communities. And while some platforms' "best" may be wanting, Section 230 applies to all platforms, including those sincere in wanting to create the best possible user experience, which they could not do if they had to litigate whether they were worthy of that protection.

Ultimately, despite what plaintiffs-appellants argue, Section 230 is not a bar to platforms looking after the interests of their users. Instead it is a necessary predicate for them to even be able to try.

### III. Finding that Section 230 does not bar these claims would result in harm that would be widely felt by online platforms and speakers, including by amicus Copia Institute

Omegle and amicus Copia Institute are very different enterprises offering platform services that, at least superficially, seem very different as well. At their core, however, both do the same thing: provide "interactive computer services" that help people communicate with each other, and as interactive computer services both are protected by Section 230. Which also means that if Section 230's protection is diminished for Omegle, it will be diminished for all other interactive computer services, including those of the Copia Institute.

As an enterprise whose business is about examining the law and policy surrounding innovation, the Copia Institute depends on Section 230 in several ways. One way is as a speaker itself. Not only does it depend on social media platforms to share its Techdirt posts and other work among the widest audience possible, but it

also uses payment providers, email providers, and other services to organize, advocate, and influence policy around the issues of its expertise, as well as sustain itself financially to pursue these efforts. These various services that the Copia Institute uses, services whose business is to in some way facilitate content supplied by others, all depend on Section 230 to fulfill this mission. Without the benefit of this statute they would either cease to provide these services, or they would offer them only at the prohibitive cost necessary to underwrite the massive amount of extra manpower they would need to deploy in order to monitor the myriad and voluminous third-party user activity they facilitate – if not also subsidize the direct cost of having to defend themselves, even potentially successfully, for what lawsuits that might arise from any of it. *See* Michael Masnick, *Don't Shoot The Message Board*, June 2019, available at https://copia.is/library/dont-shoot-the-message-board/ (documenting how weakening legal protections for platforms deters investment in technology and online services that ultimately foster online expression).

Meanwhile, Section 230 also helps the company generate revenue, including by offering subscribers private forums where those who pay a premium for membership can interact. Offering these forums is only possible because of Section 230's protections. Furthermore, like many other online publications, Techdirt posts have contained ads. As is often the case for online media outlets, ads are geneally

15

provided by third-party services. Section 230 is what makes this sort of funding model possible. Without it, sites like Techdirt would have to spend their limited resources vetting each and every ad appearing on any of their pages. Techdirt is nearly twenty-five years old and has more than 70,000 posts. Not only have these thousands of posts collected thousands of comments, but there have been thousands of ads appearing on these pages. It would be an impossible task to muster the enormous amount of attention and expertise required to vet them all. But without Section 230 shielding sites like Techdirt from this burden, they would need to. Running third-party ads would no longer be a viable way of generating revenue, and sites that depend on them to be financially stable, as well as the services that provide them, would disappear.

The Copia Institute also uses Section 230 to advance discourse, including by allowing comments on its articles and commentary, which, again, requires the company to act as a platform for other users' expression. These comments add to the richness of the discourse found on its pages and allows the Copia Institute to build a dialog around its ideas. They also often help the Copia Institute's own expression be more valuable, with story tips, error checking, and other meaningful feedback provided by the reader community.[9]

---

[9] In fact, so productive is the Techdirt comment section that the Copia Institute has even hired onto staff someone who had previously been a regular contributor to the discussion there.

16

But none of this discourse would be possible without Section 230 shielding Techdirt from liability for what these commenters say. If Techdirt had to worry about the potential liability that could arise from each and every comment, it would not be able to enable its readers to comment freely. Far less discussion and discovery would result, including on controversial topics where productive discourse depends on attracting substantive insights. Without the protection Section 230 affords, people who object to certain ideas would be able to use the threat of liability to pressure Techdirt to delete those they found distasteful, no matter how legitimate and important that user contribution might have been.

The threat of litigation by parties unhappy with expression found on Techdirt pages is a very real one. As this litigation illustrates, technology policy can be contentious subject, and Techdirt's trenchant (and First Amendment-protected) commentary can ruffle feathers. Those who are ruffled can be tempted to threaten litigation,[10] but thanks to the First Amendment and Section 230 those threats are ordinarily little more than toothless bluster. But on the occasion that one slipped through and turned into a live lawsuit, the results were devastating to the company. The price of defending the speech in question, which included a related user

---

[10] *See*, *e.g.*, Michael Masnick, *Hey North Face! Our Story About You Flipping Out Over 'Hey Fuck Face' Is Not Trademark Infringement*, TECHDIRT (Nov. 15, 2021), https://www.techdirt.com/articles/20211112/14074147927/hey-north-face-our-story-about-you-flipping-out-over-hey-fuck-face-is-not-trademark-infringement.shtml.

comment, was lost time and money, lost sleep for the company's principal and editor, lost opportunity to further develop the company's business, and a general chilling of the company's expressive activities.[11]   And that was just one lawsuit that still resulted in protected expression remaining online.[12]

The Copia Institute is obviously different from Omegle in several ways: it is a different sort of entity, with different business purpose, handling user expression in different ways and likely with regard to different subject matter.  But all of these Internet platforms – Omegle, Techdirt, and the myriad platform services the Copia Institute uses, plus countless more services out in the world already, or yet to be invented – are part of an online ecosystem that depends on a robust and functional Section 230 being available to them all.  The plain text of the statute, as well as more than two decades of jurisprudence, have made clear that all are equally entitled to its protection, including with respect to the sort of potential liability as present in this case.  It is that reliability, ubiquity, and durability of this statutory protection that has made it possible for all these platforms, and all the speakers and services they enable,

---

[11] *See* Michael Masnick, *The Chilling Effects Of A SLAPP Suit: My Story*, TECHDIRT (Jun. 15, 2017), https://www.techdirt.com/articles/20170613/21220237581/chilling-effects-slapp-suit-my-story.shtml.
[12] Michael Masnick, *Our Legal Dispute With Shiva Ayyadurai Is Now Over*, TECHDIRT (May 17, 2019), https://www.techdirt.com/articles/20190516/22284042229/our-legal-dispute-with-shiva-ayyadurai-is-now-over.shtml.

to enrich the world.  Regardless of how tempting it may seem to whittle away at its coverage now in order to reach any particular platform – such as Omegle – doing so should be resisted because it would mean ripping it away from them all.

## CONCLUSION

For the forgoing reasons, the district court decision should be upheld.

Dated: June 24, 2022

By:  /s/ Catherine R. Gellis__
Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone:  202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amicus Floor64, Inc. d/b/a The Copia Institute In Support Of Plaintiffs-appellants complies with the word limit of Fed. R. App. P. 29(c)(2) because this brief contains 4671 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: June 24, 2022                    By:  /s/ Catherine R. Gellis__

                                        Catherine R. Gellis

                                        *Counsel for Amicus Curiae*

20

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on June 24, 2022.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 24, 2022                              By:   /s/ Catherine R. Gellis

                                                  Catherine R. Gellis

                                                  *Counsel for Amicus Curiae*

21